[No. A103320. First Dist., Div. Two. June 22, 2004.]

In re GEORGE SCOTT on Habeas Corpus.

## COUNSEL

George Scott, in pro. per.; and Michael Satris under appointment by the Court of Appeal, for Petitioner.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Asstistant Attorney General, Frances T. Grunder, Asstistant Attorney General, Anya M. Binsacca and Brian G. Walsh, Deputy Attorneys General, for Respondent Tom L. Carey.

## OPINION

**KLINE, P. J.**—George Scott killed a man who supplied amphetamines and cocaine to his wife and entered into a sexual relationship with her after she became addicted. Scott was convicted of second degree murder with the use of a firearm. He is serving a state prison term of 15 years to life plus two years due to his use of a firearm and has been incarcerated since 1987.

On September 24, 2001, Scott appeared before a panel of the Board of Prison Terms (the Board) for his second subsequent parole consideration

hearing. The panel denied parole and, on January 3, 2002, Scott administratively appealed that decision. The appeal was denied 10 months later, on October 8, 2002. On September 17, 2002, prior to denial of his administrative appeal, Scott was afforded his third subsequent parole consideration hearing. The Board panel of two commissioners was divided and, as it was unable to render a decision, ordered the case sent to an en banc panel. On October 8, 2002, the Board, sitting en banc, unanimously found Scott unsuitable for parole. Scott filed an administrative appeal from that decision on December 16, 2002, and the appeal was denied six months later, on June 10, 2003. However, previously, on January 29, 2003, Scott filed a petition for writ of habeas corpus in the San Mateo County Superior Court, challenging the denial of parole in 2001. Without issuing an order to show cause, and without briefing of any sort, the superior court denied that petition on February 18, 2003.[1]

Scott filed a petition for writ of habeas corpus in this court on July 24, 2003. We issued an order to show cause directed at respondent Tom L. Carey, Warden of the California State Prison at Solano, and appointed counsel for petitioner. Pursuant to our order to show cause, respondent filed a return, and petitioner's counsel has filed a denial or traverse. Even though we generally require that application first be made to the superior court before filing a petition for writ of habeas corpus in this court (*In re Hillery* (1962) 202 Cal.App.2d 293 [20 Cal.Rptr. 759]), we are not reviewing the trial court's ruling. Where relief is denied in the trial court, the petitioner can only proceed further by a new application in an appellate court. (*People v. Ryan* (1953) 118 Cal.App.2d 144, 149 [257 P.2d 474].) Thus, the petition before us is an original proceeding.

---

[1] Pointing out that on September 17, 2002, petitioner received his third subsequent parole consideration hearing, which is "the only possible relief which this Court could order," respondent maintains that this case is now moot and the petition should be denied on that ground. We disagree. It is true that a prisoner challenging a Board decision must file an administrative appeal before he can prosecute a petition for writ of habeas corpus. (See, e.g., *In re Dexter* (1979) 25 Cal.3d 921, 925 [160 Cal.Rptr. 118, 603 P.2d 35].) However, as this case shows, such appeals are frequently not processed before the inmate's next parole hearing, which moots the administrative appeal, not just a petition for habeas corpus that had to await completion of the administrative appeal. It is appropriate for an appellate court to exercise its discretion to retain and decide an issue that is technically moot where, as in this case, "the issue is 'presented in the context of a controversy so short-lived as to evade normal appellate review' [citations], or when it is likely to affect the future rights of the parties [citation]." (*Chantiles v. Lake Forest II Master Homeowners Assn.* (1995) 37 Cal.App.4th 914, 921 [45 Cal.Rptr.2d 1].) A moot case may also be retained if, as also appears to be true in this case, the same controversy between the parties is likely to recur. (*Cucamongans United for Reasonable Expansion v. City of Rancho Cucamonga* (2000) 82 Cal.App.4th 473, 479–480 [98 Cal.Rptr.2d 202]; *Dobbins v. San Diego County Civil Service Com.* (1999) 75 Cal.App.4th 125, 128, fn 3 [89 Cal.Rptr.2d 39].)

## BACKGROUND

1. *The Crime*

During the spring and summer of 1986, Scott noticed several dramatic changes in his wife's demeanor and behavior, such as inattention to duties at home and at work, loss of weight, and uncharacteristically erratic conduct. Scott eventually discovered she had become addicted to cocaine and amphetamines and was having an affair with her drug dealer, Douglas Bradford. Scott reported Bradford's illegal activities to the police, but they refused to respond. When Bradford learned of Scott's attempts to involve the police, he told Scott he would "do him in" if he did not cease these efforts. Following a series of ineffectual attempts to deal with his wife's addiction and several confrontations with Bradford, including one in which Bradford displayed a firearm, Scott became increasingly distressed and concerned for his personal safety. Due to his fear of Bradford, Scott moved out of the family residence into a mobilehome.

On July 4, 1986, Scott's wife visited him at the mobilehome to remorsefully confide her intention to stop using drugs and end her relationship with Bradford. At some point, she said she was not feeling well and needed to go home to take medication but would return to stay the night with Scott. When she failed to return, Scott suspected she had gone to Bradford's residence and went there to find her. When he arrived, he saw Bradford, Scott's wife, and Scott's 13-year-old son watching fireworks in front of the house with others. Bradford and Scott's wife were affectionately "hugging" one another. At that point, according to witnesses, Scott approached with a .22-caliber handgun, Bradford pushed Scott's wife out of the way and confronted Scott. As Bradford moved toward him, Scott told him, "Get away. I'm going to shoot you." After firing two or three rounds, which struck Bradford in the head and thigh, Scott left the scene.

Police officers dispatched to the scene found Bradford lying face-up in the street, still alive. Scott's wife told the officers, "Scotty shot him." At the request of the officers, Scott's son called his father's pager number. Scott called back and spoke with a police officer. Crying, and with a shaking voice, he told the officer, "I really blew it." Paramedics transported Bradford to Peninsula Hospital, where he died seven days later. Three days after the shooting, Scott went to the sheriff's office to turn himself in.

By a single count information filed on September 25, 1986, Scott was charged with first degree murder. Apparently in consideration of the possibility Scott might successfully claim self-defense,[2] the district attorney offered Scott a plea bargain. In return for a plea of guilty to manslaughter, the district attorney agreed to support a nine-year sentence. Scott's attorney advised him to reject the offer, predicting his claim of self-defense would prevail and he would be acquitted at trial. Scott did not take the stand and called no witnesses.[3]

On December 29, 1986, a jury returned a verdict finding Scott guilty of first degree murder based on the felony-murder rule. On December 31, 1986, after the jury was directed to continue to deliberate upon the remaining grounds on which murder was charged, it returned verdicts of "not guilty of first degree murder based upon premeditation and deliberation," and guilty of murder in the second degree based upon malice aforethought.[4]

[2] The sentencing report prepared by the San Mateo County Probation Department acknowledges "there may well have been some provocation [of Scott] on the part of the victim," and a Department of Corrections evaluation relates that Scott's "description of the events leading up to his arrests closely match those found in the probation officer's report and other official records." Scott claimed not only that his victim had threatened to kill him if he went to the police, but that he fired defensively at the victim "after he did not respond warnings to stay back from . . . Scott." At the parole hearing on September 24, 2001, Scott stated under oath that three weeks prior to the killing Bradford "put a gun in my face and told me he was going to blow my head off and in a number of vulgar ways of saying it, I guess. He threatened to blow my head off for going to the police over the fact that he was supplying my wife with drugs." Scott also said that at the time of the killing, "when he went for his gun, what I believed was his gun, I fired a warning shot at him in his direction, the next thing I knew he came around the front of the car, I wanted to go down the street that way to get away from this, I didn't want no part of this, and as he came around he was trying to pull a gun out of his waistband and I started running backwards, telling him to stay aware [sic] from me or I'll shoot you, by then I had, well I did have my gun out and he chased me backwards." Scott admitted he never saw a gun in Bradford's hand, "because I didn't, but he had both hands over on his side and he was going like this, I figured that if he gets that out I'm dead, and I just fired trying to scare him off and give me time to get away." During the previous 10 years Scott often carried a gun because "I carry a lot of money in the refrigeration and beverage business, the deli also, the money there, I handled all that back and forth to the bank for both businesses." Scott realized the need to carry a weapon after "a friend of mine one night stops at a place to make some refrigeration work, take care of some refrigeration work, he ended up getting killed, robbed and killed on the street corner."

[3] At the 2002 parole hearing, Scott's counsel informed the Board that Scott successfully sued his original defense counsel for breach of contract and used the damages he received (reimbursement of the funds he paid the attorney) "to pay off a wrongful death action that had been initiated by the victim's family."

[4] This information is taken from the probation report, which is the only evidence of what transpired at trial that is included in the record. The probation report does not, however, reveal the independent felony on which the felony-murder theory was based. At oral argument in this court, counsel for Scott stated, and counsel for respondent agreed, that the independent felony was robbery. According to counsel, before Scott shot Bradford he took his wife's purse, which she had placed on the hood of a car. It is not clear why he did so. The probation report does

At the sentencing hearing on November 6, 1987, Scott moved for a new trial on first degree murder. In response, the district attorney offered to stipulate to the relief Scott sought if he would enter a plea of guilty to second degree murder and waive his right to appeal. Scott accepted the offer. The bargain did not address the question whether to impose a consecutive term for the use of a firearm, which was left to the discretion of the court after considering the probation report and the arguments of counsel. After an appropriate inquiry, the trial court found Scott "knowingly and intelligently entered into the stipulation, and waived his right to appeal" and granted Scott's motion for new trial "as to the first degree felony murder conviction." The court sentenced Scott to state prison for 15 years to life, the base term for murder in the second degree. (Pen. Code, § 190.) Exercising its discretion not to strike additional punishment for personal use of a firearm (Pen. Code, § 12022.5), the court also imposed an additional and consecutive term of two years for the use of a firearm.

### 2. *Scott's Background*

Scott was born in San Francisco on September 23, 1940, to an intact family. His mother died shortly after childbirth and he and his father resided with his maternal grandparents until he was nine, at which time his father remarried. Three additional children were born of that union. The family atmosphere was healthy and free of lawbreaking, mental illness, or substance abuse. Scott dropped out of high school in his senior year to join the Navy. He served four years, until the age of 21, and received an honorable discharge. While in the Navy, he earned a GED and learned several machinery-related trades. Scott married in 1962, a year after he was discharged, and the marriage, which remained intact until 1993, produced three sons and a daughter. Scott now has nine grandchildren.

Upon leaving the service, Scott was employed by a soft drink company and remained there until the instant offense, eventually becoming a part-owner. He and his wife also purchased a delicatessen in San Francisco, which was successful until others began using it as a venue for drug dealing and Scott's wife began taking money from the business in order to pay her drug supplier.

Except for the present offense, Scott has no criminal record other than for minor Vehicle Code violations when he was a juvenile.

---

not indicate whether the "single count information" charged robbery, but it is not necessary for a prosecutor relying on the felony-murder rule to plead the underlying felony, so long as the elements of that offense are proved, as was apparently the case here. (*People v. Scott* (1991) 229 Cal.App.3d 707, 716 [280 Cal.Rptr. 274], citing *In re Walker* (1972) 10 Cal.3d 764, 781 [112 Cal.Rptr. 177, 518 P.2d 1129].)

### 3. *Scott's Incarceration*

According to an evaluation prepared by the Department of Corrections, Scott "has been an extremely valuable worker in the prison heating and cooling services" whose "file includes literally pages of laudatory chronos." The report concurred with an earlier evaluation of Scott, which approvingly describes him as a "workaholic."

In tests given in prison, Scott earned "maximum scores in both major academic areas," and his "[n]ative intelligence is at the very least average." He has exhibited no tendencies to sexually aberrant behavior, has never used drugs, drank only moderately prior to confinement, and has no medical or psychiatric problems. Scott remains in touch with all members of his immediate family, including his former wife. The evaluation states that Scott "seems to be on top of his trade and should be promptly employable on release." When released from prison, Scott plans to join up with his youngest son, who works in the refrigeration field in which Scott is skilled. Another son has offered to provide housing until Scott is financially secure.

Dr. Dean J. Clair, a psychologist who evaluated Scott in 2001, believed that "the key background element" in evaluating Scott "appears to be a marriage which was disintegrating behind the addictiveness and infidelity of [his] wife." He "has a life totally free of violence apart from the era in which his marriage was falling apart. He has no writeups—serious or otherwise— after spending thirteen years in an environment in which it is quite easy to get written up purely by accident. [¶] Mr. Scott has had a long and active participation in . . . self-help programs such as Breaking Barriers and Men's Violence Prevention. Exit comments note that he has developed insights into the breakdown of controls, which led to his commitment offense. [¶] It is only half in jest that I estimate that Mr. Scott, if released, would pose no greater or less a threat to the public order than would the writer himself."

Dr. Clair's evaluation notes that when, in 1999, the Board denied Scott parole for two years, it did not mention the "thorough and painstaking" report prepared that year by another psychologist, Dr. Stephen J. Donoviel. Suggesting that Dr. Donoviel's report "may not have been available" when the Board denied parole in 1999, the 2001 report indicates that it is simply a summary and "update" of the earlier report. Dr. Donoviel's detailed report emphasized not only the authenticity of Scott's remorse and the "considerable insight" he gained from prison programs, but the uncharacteristic nature of his criminal act and the extenuating circumstances that led to it: "for the first 23 to 24 years of their relationship, [Scott and his wife] were a relatively healthy and happy middle to upper-middle class family who worked hard and enjoyed the benefits of their labors. Although both parents worked hard and long hours, it

appears that it was not until his wife became addicted to methamphetamines and cocaine and subsequently had an affair with her dealer that their marriage fell apart." The report continued: "While it is evident from [Scott's] description and the record that he was under considerable pressure and experiencing extreme distress several months prior to the instant event in his attempts to deal with his wife's cocaine and amphetamine addiction and subsequent deterioration and probably was suffering from a diagnosable adjustment disorder at that time, I find no evidence to warrant a diagnosis on either Axis I or Axis II at the present time. It appears that Mr. Scott is and has been dealing with the rigors of prison life as well as anyone could be expected to do and from all reports he performs his work in an exemplary fashion and interacts with all those he is in contact with in a respectful and appropriate manner."

Dr. Donoviel's evaluation concluded with the following observations: "As noted above, there has been no indication of aggressive or violent behavior since his incarceration and there were no indications for any such behavior in the first 45 years of his life. In view of the lack of problematic behavior in this institution[al] setting and given his history prior to the circumstances surrounding the instant event, it is my opinion that he presents a less than average risk of future violence if released to the community. He clearly is capable of following rules and expectations and would in my opinion be extremely compliant with any conditions of parole. In view of his work history prior to incarceration and since being institutionalize[d], he has various skills that would lend themselves to ready employment." Dr. Donoviel concluded that Scott "offers positive prognosis for living in the community," noting that Scott has "supportive relationships with family and friends," as well as "discipline free years of incarceration, exemplary work record both since his institutionalization and prior to that time, viable opportunities for gainful employment and a prosocial crime free history until the instant offense."

### 4. The 2001 Parole Board Hearing

At the hearing on September 24, 2001, a three-member panel of the Board reviewed the facts of Scott's crime, his relationship with his children, grandchildren and former wife, his record in prison, and how he would conduct himself on the outside if given parole. Scott expressed remorse for his crime and sorrow for the victim and his family. Asked his state of mind at the time, Scott replied; "I couldn't be any more shocked than anyone else that I actually shot him. I never gave a thought to it that it could possibly even happen." After Scott explained that he went to Bradford's house due to a profound desire "to keep my family together," a Board member asked whether similar circumstances might lead him to violence in the future. Scott

answered, "I just couldn't ever be that way again," and attributed this to the many self-help programs he participated in while in prison.

Shifting attention to Scott's conduct in prison, a panel member observed that he "has not received as much as a custodial counseling chrono, much less the more serious CDC 115's." The panel member then described numerous correctional counselor reports uniformly lauding Scott for his "excellent" progress while in prison and pointing out, among numerous other supportive statements, his "work ethic," "mature attitude," and the high quality of his interpersonal relationships. Most of these reports emphasized Scott's sustained and productive participation in a variety of self-help programs, including "Thinking Skills for Offense Prevention," the "Victim Offender Reconciliation Group," "Breaking Barriers," "Men's Violence Prevention" and the "Human Development Seminar."

All of Scott's children informed the Board in writing of their intention to collectively provide him housing, financial assistance, work in the refrigeration business and a supportive family environment. A former business partner and a veteran's organization also expressed their ability and willingness to provide Scott employment in the field of refrigeration.

After further questioning of Scott and closing statements from the district attorney, defense counsel, Scott himself, and the victim's daughter, the Board panel recessed to deliberate. When the panel reconvened a short time later, the presiding officer declared "that the prisoner is not yet suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison." In reaching this conclusion, the panel relied primarily upon the "especially cruel" manner in which Scott committed his offense and his "history of unstable or tumultuous relationships with others." Finding that Scott "needs therapy in order to face, discuss, understand, and cope with stress in a non-destructive manner," the panel concluded that he "continues to be unpredictable and a threat to others." The panel acknowledged "that there are things that the prisoner should be commended for"— naming his excellent work reports, "disciplinary-free" conduct, participation in self-help programs, and favorable psychiatric report—but felt "these positive aspects of the prisoner's behavior at this time does [sic] not outweigh the factors of unsuitability."

## DISCUSSION

### I.

### *The Standard of Review*

As noted, in denying relief the court below did not conduct an evidentiary hearing. This is therefore an original proceeding in which we independently review the record. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 677 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*).)

In *Rosenkrantz*, our Supreme Court held "that the judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure that the decision comports with the requirements of due process of law, but that in conducting such a review, the court may inquire only whether *some evidence* in the record before the Board supports the decision to deny parole, based upon the factors specified by the statute and regulation. If the decision's consideration of the specified factors is not supported by some evidence in the record and thus is devoid of a factual basis, the court should grant the prisoner's petition for writ of habeas corpus and should order the Board to vacate its decision denying parole and thereafter to proceed in accordance with due process of law." (*Rosenkrantz, supra*, 29 Cal.4th at p. 658, italics added.)

While the Board's discretion over parole suitability determinations is broad, it is not complete. (*In re Ramirez* (2001) 94 Cal.App.4th 549, 560 [114 Cal.Rptr.2d 381] (*Ramirez*).) As noted in *Ramirez*, prior to 1976, "the Adult Authority (the Board's predecessor) was vested with considerably more discretion over term and parole decisions under the indeterminate sentence law than the Board now wields under the determinate sentencing law. [Citations.] Former Penal Code section 3041, subdivision (a), provided simply that '[i]n any case the matter of parole may be determined by the Adult Authority at any time after the actual commencement of such imprisonment.' [Citations.] Under the former statutes, our Supreme Court recognized that 'the decision to grant or deny parole is committed entirely to the judgment and discretion of the Adult Authority,' but the court also noted the prisoner's 'right . . . to have his application duly considered.' [Citation.]" (*Ramirez*, at p. 560.) The amendment of section 3041 in 1976, when the determinate sentencing law was enacted, has changed the situation. The current version of the statute provides "a clear orientation for the Board's discretionary decisions over parole dates for inmates serving indeterminate sentences, mandating that the Board 'shall normally set a parole release date . . . in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public . . . .' (Pen.

Code, § 3041, subd. (a).) The Board is required to 'establish criteria for the setting of parole release dates.' (*Ibid.*) However, it lacks discretion to promulgate regulations that are inconsistent with the governing statutes, and the judicial branch has the final word on questions of legal interpretation. [Citation.]" (*Ramirez,* at p. 559.)

## II.

### *The Governing Statute*

Scott's petition advances the threshold procedural contention that the Board did not consider his suitability for parole in the manner required by Penal Code section 3041.

As material, subdivision (a) of Penal Code section 3041 provides: "One year prior to the inmate's minimum eligible parole release date a panel consisting of at least two commissioners of the Board of Prison Terms shall again meet with the inmate and shall normally set a parole release date as provided in Section 3041.5. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates. The board shall establish criteria for the setting of parole release dates and in doing so shall consider the number of victims of the crime for which the prisoner was sentenced and other factors in mitigation or aggravation of the crime." Subdivision (b) of that statute provides, as pertinent, that "[t]he panel or board shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of the current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting."

Scott contends that the Board failed to comply with the mandate of Penal Code section 3041, because it did not determine whether he was suitable for release "in a manner that will provide for uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public" as required by subdivision (a). In Scott's view, this language requires the Board to preliminarily undertake a proportionality analysis by measuring his criminal conduct against that of others convicted of the same offense whose conduct was "of similar gravity and magnitude in respect to their threat to the public." Scott maintains, in short, that uniformity in sentencing must be considered as an aspect of the determination that an inmate is suitable for release. This interpretation of the statute rests heavily on *Ramirez, supra,* 94

Cal.App.4th 549, particularly the statement in that opinion that "[i]n order to comply with the parole policy established by the Legislature in Penal Code section 3041, the Board must weigh the inmate's criminal conduct not against ordinary social norms, but against other instances of the same crime or crimes. . . . The Board must also consider the length of time the inmate has served in relation to the terms prescribed by the Legislature for the offenses under consideration, in order to arrive at a 'uniform' term as contemplated by Penal Code section 3041." (*Ramirez*, at p. 570.) Pointing out that, like the present case, *Ramirez* related to the propriety of a suitability determination, Scott contends that the quoted language means that "the suitability determination and the uniform term-fixing function are one entity, like a coin with two sides."

Respondent argues that the Board "must not" engage in proportionality analysis until it has first determined that the prisoner in question is suitable for release as posing no threat to public safety; according to respondent, it is only then, when it sets the base term to be served, that the Board need concern itself with uniformity in sentencing and conduct a proportionality analysis. Respondent rests this argument on the statement in subdivision (b) of Penal Code section 3041 that the Board "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." The pertinent Board regulation adopts this view of the statute. (Cal. Code Regs., tit. 15, § 2402, subd. (a)[5] ["The panel shall first determine whether the life prisoner is suitable for release on parole. *Regardless of the length of time served*, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." (Italics added.)].)[6] Scott contends that the regulation exceeds the scope of the authority conferred by the enabling statute. (*Terhune v. Superior Court* (1998)

---

[5] All unspecified section references are to title 15 of the California Code of Regulations.

[6] Board regulations provide that, after an inmate is deemed suitable for release, uniformity in sentencing is taken into account in the setting of his or her release date. The regulation requiring the Board to set a base term for each life prisoner found suitable for parole provides: "The base term shall be established solely on the gravity of the base offense, taking into account all of the circumstances of that crime. The base offense is the most serious of all life offenses for which the prisoner has been committed to prison. [¶] The base term shall be established by utilizing the appropriate matrix of base terms provided in this section for the base offense of which the prisoner was convicted. The panel shall determine the category most closely related to the circumstances of the crime. The panel shall impose the middle base term reflected in the matrix unless the panel finds circumstances in aggravation or mitigation. [¶] If the panel finds circumstances in aggravation or mitigation . . . , the panel may impose the upper or lower base term provided in the matrix, stating the specific reason for imposing such a term. A base term other than the upper, middle or lower base term provided in the matrix may be

65 Cal.App.4th 864, 873 [76 Cal.Rptr.2d 841] ["an administrative agency has no discretion to promulgate a regulation that is inconsistent with the governing statutes"].)

Penal Code section 3041 is ambiguous as to the manner in which uniformity in sentencing is to be taken into account in the determination whether a prisoner is suitable for release from prison. Given the delicate balance the Board is required to strike between the interests of the prisoner and those of the public, the ambiguity cannot easily be resolved as a matter of policy. It is true, as Scott argues, that uniformity in sentencing was the overarching purpose of the determinate sentencing law (DSL).[7] Terms served by life prisoners are not likely to be reasonably uniform, by any measure, if that value is wholly ignored at the time the Board determines whether a life prisoner is suitable for release. But it is also true, as respondent maintains, that the language of subdivision (b) makes clear the Legislature's concern with public safety, a value not necessarily related to and sometimes in conflict with that of uniformity.

We find it unnecessary to resolve the knotty question (now before our Supreme Court[8]): whether the Board must concern itself with uniformity in sentencing when it determines whether an inmate is suitable for release, and engage in a proportionality analysis at that time, as Scott maintains; or whether the Board may first determine whether the inmate is suitable for parole because he or she is no longer a threat to public safety, and engage in a proportionality analysis only if it finds the inmate suitable for parole, as respondent maintains. As we now proceed to explain, the Board's decision that Scott was unsuitable for release from prison must be set aside even if respondent's view is correct, because—entirely apart from the issue of uniformity in sentencing—the evidence that Scott presents a threat to public safety is inadequate even under the indulgent "some evidence" standard of review.

---

imposed by the panel if justified by the particular facts of the individual case." (§ 2282, subd. (a).) This regulation includes a matrix designed to ensure sentencing uniformity by looking both to the offense and the circumstances and manner in which it was committed. (§ 2282, subd. (b).)

[7] The first two sentences of the DSL declare "that the purpose of imprisonment for crime is punishment" and that "[t]his purpose is best served by terms proportionate to the seriousness of the offense with provision for uniformity in the sentences of offenders committing the same offense under similar circumstances." (Pen. Code, § 1170, subd. (a)(1).) Nothing in the DSL or its legislative history suggests that legislative concern with uniformity was limited to those serving determinate terms. Penal Code section 3041 shows that this interest does extend to individuals such as Scott who are serving indeterminate life terms. (*Ramirez, supra*, 94 Cal.App.4th at p. 559.)

[8] *In re Dannenberg*, petition for review granted January 15, 2003 S111029.■

# III.

## *The Governing Board Regulations*

Board regulations defining the manner in which suitability determinations are to be made are set forth in section 2402, which consists of four subdivisions. As earlier noted, subdivision (a) states that "[r]egardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison."

Section 2402, subdivision (b) provides that "[a]ll relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability."

Section 2402, subdivision (c) identifies six nonexclusive circumstances tending to show unsuitability, the relative importance of which "is left to the judgment of the panel." The specified circumstances are: "(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. . . . [¶] . . . [¶] (2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age. [¶] (3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others. [¶] (4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim. [¶] (5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense. [¶] (6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail."

Section 2402, subdivision (d), which we discuss later (see discussion, *post*, at pp. 897–899), identifies nine circumstances tending to show suitability for release.

The Board determination that Scott would pose a threat to public safety if released from prison, and was therefore unsuitable, rested on two of the six

"circumstances tending to indicate unsuitability"—his "Commitment Offense" and "Unstable Social History." (§ 2402, subd. (c)(1), (3).)

## IV.

### *There Is Not "Some Evidence" That Scott Committed His Offense in a Manner Showing He is Unsuitable for Release*

The Board finding that Scott was unsuitable for release in part because he committed his offense "in an especially cruel and callous manner" obviously referred to a provision of its regulations indicating that a prisoner may be unsuitable if he committed his offense "in an especially heinous, atrocious or cruel manner." (§ 2402, subd. (c)(1).) The provision specifically identifies five "factors" to be considered in determining whether a prisoner committed his or her offense in that manner: "(A) Multiple victims were attacked, injured or killed in the same or separate incidents. [¶] (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder. [¶] (C) The victim was abused, defiled or mutilated during or after the offense. [¶] (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. [¶] (E) The motive for the crime is inexplicable or very trivial in relation to the offense." (§ 2402, subd. (c)(1)(A)–(E).)

The Board's finding that Scott committed his offense "in an especially heinous, atrocious or cruel manner," relied on factors (B), (D) and (E) of section 2402, subdivision (c)(1). The record contains no evidence supporting these determinations, however.

A. *Scott's Offense Was Not Committed in a Dispassionate and Calculated Manner*

The relevant evidence does not merely fail to support but refutes the conclusion that Scott committed his offense in a dispassionate and calculated manner. A life prisoner evaluation report prepared by the Department of Corrections lists the fact that Scott committed the crime "during a brief period of extreme mental or emotional trauma" as a significant mitigating factor, and on the basis of that and other factors, concludes he "would probably pose a low degree of threat" to the public if released from prison. Dr. Donoviel made the same point, stating that Scott "was under considerable pressure and experiencing extreme [mental] distress several months prior to the instant event in his attempts to deal with his wife's cocaine and amphetamine addiction and subsequent deterioration and probably was suffering from a diagnosable adjustment disorder at that time . . . ." Dr. Clair concurred, stating that "[t]he key background element [of the 'life crime']

appears to be a marriage which was disintegrating behind the addictiveness and infidelity of [Scott's] wife. [¶] . . . [¶] [Scott] has a life totally free of violence apart from the era in which his marriage was falling apart." None of the many other reports in the record relating to the manner in which Scott perpetrated the commitment offense suggests he acted in a "dispassionate or calculated manner;" indeed, they too suggest the very opposite.[9]

So does the only other evidence in the record bearing on the manner in which Scott committed his offense: the action of the San Mateo County District Attorney and the verdict of the jury. Scott's attorney emphasized at the Board hearing that Scott was offered a plea requiring him to plead guilty to manslaughter, which does not require premeditation (i.e., a crime committed in a "calculated" manner). The deputy district attorney appearing before the Board did not dispute this statement and did not argue that parole should be denied for any of the reasons given by the Board.[10] It is impossible to imagine prosecuting authorities would have made such an offer if they believed they could show Scott acted "in a dispassionate and calculated manner, such as an execution-style murder." More importantly, the Board's finding that Scott acted in a dispassionate and calculated manner flies in the face of the findings of Scott's jury. As noted, the jury convicted on the basis of the felony-murder rule, which does not require malice or premeditation. (1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Crimes Against the Person, § 134, p. 750.) Under the felony-murder doctrine, a defendant who kills accidentally may nevertheless be convicted of murder in the first degree. (See *People v. Coefield* (1951) 37 Cal.2d 865, 868 [236 P.2d 570].) As reported in the probation report, the verdict in this case explicitly states that Scott was found "not guilty of first degree murder based on premeditation and deliberation," and the prosecution accepted that determination by accepting Scott's plea to second degree murder, which does not involve premeditation. The decisions of the jury and the district attorney (which unlike the Board, were familiar with all the relevant evidence) are wholly inconsistent with the Board's finding that Scott acted "in a dispassionate and calculated manner, such as an execution-style murder" (§ 2402,

---

[9] Moreover, as we later point out (see discussion, *post*, at pp. 897–899), under the regulations, the undisputed evidence Scott committed his offense while under emotional stress should have been, but was not, considered in his favor. Subdivision (d)(4) of section 2402, which lists the circumstances tending to indicate *suitability* for release, includes the circumstance that "[t]he prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time."

[10] The district attorney's testimony was essentially that the commitment offense was "a self-centered deal," Scott was not like "Sir Gallahad [*sic*] trying to . . . get Genuviere [*sic*] back in line," and he refuses to "envision[] himself as a murderer." Repeatedly emphasizing that Scott refused to admit "I am a stalker," "I am a murderer," "I did an evil act," the district attorney thought "he needs to do that before you should feel comfortable . . . and so that's why I feel he should not have a parole date at this time."

subd. (c)(1)(B)), for which the present record provides not a scintilla of evidence.

### B. *The Manner in Which Scott Committed His Offense Does Not Demonstrate an Exceptionally Callous Disregard for Human Suffering*

"[A]ll second degree murders by definition involve some callousness—i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of others. [Citation.] As noted, however, parole is the rule, rather than the exception, and a conviction for second degree murder does not automatically render one unsuitable." (*In re Smith* (2003) 114 Cal.App.4th 343, 366 [7 Cal.Rptr.3d 655], italics omitted.) In *Ramirez, supra,* 94 Cal.App.4th 549, as in this case, the Board denied a parole release date on the basis of a finding that the nature of the inmate's offense displayed a "callous disregard for human suffering." (*Id.* at pp. 558, 568.) Setting aside that determination, the court agreed that "the gravity of the commitment offense or offenses alone *may* be a sufficient basis for denying a parole application, so long as the Board does not fail to consider all other relevant factors," (*id.* at p. 569), but attached an important caveat. As the court explained, "[a]ll violent crime demonstrates the perpetrator's potential for posing a grave risk to public safety, yet parole is mandatory for violent felons serving determinate sentences. (Pen. Code, § 3000, subd. (b)(1).) And the Legislature has clearly expressed its intent that when murderers—who are the great majority of inmates serving indeterminate sentences—approach their minimum eligible parole date, the Board 'shall normally set a parole release date.' (Pen. Code, § 3041, subd. (a).) The Board's authority to make an exception based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is 'normally' to be granted. Otherwise, the Board's case-by-case rulings would destroy the proportionality contemplated by Penal Code section 3041, subdivision (a), and also by the murder statutes, which provide distinct terms of life without possibility of parole, 25 years to life, and 15 years to life for various degrees and kinds of murder. (Pen. Code, § 190 et seq.)" (*Ramirez,* at p 570.) ▮ Therefore, to demonstrate "an exceptionally callous disregard for human suffering" (§ 2402, subd. (c)(1)(D)), the offense in question must have been committed in a more aggravated or violent manner than that ordinarily shown in the commission of second degree murder.

*In re Van Houten* (2004) 116 Cal.App.4th 339 [10 Cal.Rptr.3d 406] illustrates the sort of gratuitous cruelty required. The prisoner in that case was involved in multiple stabbings of a woman with a knife and bayonet. While she was dying, the victim was made aware her husband was suffering a similarly gruesome fate. As stated by the court, "[t]hese acts of cruelty far

exceeded the minimum necessary to stab a victim to death." (*Id.* at p. 351.) Other examples of aggravated conduct reflecting an "exceptionally callous disregard for human suffering," are set forth in Board regulations relating to the matrix used to set base terms for life prisoners (§ 2282, subd. (b))[11]; namely, "torture," as where the "[v]ictim was subjected to the prolonged infliction of physical pain through the use of non-deadly force prior to act resulting in death," and "severe trauma," as where "[d]eath resulted from severe trauma inflicted with deadly intensity; e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or actions calculated to induce terror in the victim." (*Ibid.*) No such facts or anything remotely similar are present in this case. As in *In re Smith, supra*, 114 Cal.App.4th 343, there is no evidence Scott "tormented, terrorized, or injured [his victim] before deciding to shoot [him], or that he gratuitously increased or unnecessarily prolonged [his] pain and suffering. . . . Was the crime callous? Yes. However, are the facts of the crime some evidence that [he] acted with exceptionally callous disregard for [the victim's] suffering; or do the facts distinguish this crime from other second degree murders as exceptionally callous? No." (*Id.* at p. 367.)

■ Because the relevant evidence shows no more callous disregard for human suffering than is shown by most second degree murder offenses, the Board's use of this factor to conclude that Scott committed his offense "in an especially cruel and callous manner" was arbitrary and capricious.

## C. *Scott's Motive Was Not Inexplicable or Very Trivial in Relationship to His Offense*

The final factor relied upon by the Board as showing Scott committed his offense in "an especially cruel and callous manner" is that his "motive for the crime is inexplicable *or* very trivial in relationship to the offense." (§ 2402, subd. (c)(1)(E), italics added.) The Board did not indicate whether it found Scott's motive "inexplicable" or "very trivial in relationship to the offense," as it could not be both.[12]

■ The epistemological and ethical problems involved in the ascertainment and evaluation of motive are among the reasons the law has sought to avoid

---

[11] Under the Board regulations, base terms for life prisoners are not calculated until after an inmate is deemed suitable for release. (§ 2282, subd. (a).) The regulations therefore contemplate that an inmate may be deemed suitable for release even though his offense demonstrated "exceptionally callous disregard for human suffering." (§ 2402, subd. (c)(1)(D).)

[12] Though the Board's decision is silent on this issue, respondent's return to the order to show cause claims that it found Scott's motive "inexplicable" on the theory (which we reject, because it is blind to the record) that Scott killed Bradford only because "the victim [was] watching fireworks with his wife."

the subject. As one authority has stated, "[h]ardly any part of penal law is more definitely settled than that motive is irrelevant." (Hall, General Principles of Criminal Law (2d ed. 1960) at p. 88; see also Husak, *Motive and Criminal Liability* (1989) vol. 8, No. 1, Crim. Justice Ethics 3.) An "inexplicable" motive, as we understand it, is one that is unexplained or unintelligible, as where the commitment offense does not appear to be related to the conduct of the victim and has no other discernible purpose. A person whose motive for a criminal act cannot be explained or is unintelligible is therefore unusually unpredictable and dangerous. Scott's motive clearly does not fit this definition. He has consistently maintained, and it is undisputed, that he killed Douglas Bradford out of anger (because he was having a sexual relationship with Scott's wife and had introduced her to cocaine and amphetamines, creating a drug dependency that destroyed Scott's wife, marriage and family, as well as the family business) and fear (because Scott had been physically threatened by Bradford and knew he often carried a firearm). As these reasons are all related to the conduct of his victim, and not gratuitous, they are not "inexplicable."

Nor can it be said Scott's motive was "very trivial in relationship to [his] offense." The offense committed by most prisoners serving life terms is, of course, murder. Given the high value our society places upon life, there is no motive for unlawfully taking the life of another human being that could not reasonably be deemed "trivial." The Legislature has foreclosed that approach, however, by declaring that murderers with life sentences must "normally" be given release dates when they approach their minimum eligible parole dates. (Pen. Code, § 3041, subd. (a).) The governing statute also states that the Board shall set a release date "unless it determines that the gravity of current convicted offense or offenses, or the timing and gravity of the current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." (Pen. Code, § 3041, subd. (b).) This language means a "more lengthy period of incarceration" is called for where the gravity of the offense or offenses of the prisoner in question is more indicative of a danger to the public if the prisoner is released than would ordinarily be the case. The reference in Board regulations to motives that are "very trivial in relationship to the offense" therefore requires comparisons; to fit the regulatory description, the motive must be materially less significant (or more "trivial") than those which conventionally drive people to commit the offense in question, and therefore more indicative of a risk of danger to society if the prisoner is released than is ordinarily presented.[13] The evidence does not permit this to be said of Scott's motive.

---

[13] The validity of such an assessment turns in large part on the authenticity of the motive that is measured, which is not always apparent. For example, as pointed out in a leading study, "when one man kills another over who is to get 40 cents' change on a bar counter, the killing

■ The probation report and all of the other evaluations of Scott contained in the record show that his unpremeditated offense resulted from some provocation on the part of the victim. Though the provocation does not provide Scott a legal defense, the circumstances are similar to those which have reduced criminal liability from murder to manslaughter, as the emotional pain caused by the departure or infidelity of a loved one is often seen by juries as diminishing self-control (see, e.g., *People v. Bridgehouse* (1956) 47 Cal.2d 406, 414 [303 P.2d 1018] [holding the sudden sight of his wife's paramour in his mother-in-law's home might reasonably cause the husband, who knew his wife was having an affair with the man, to lose his ordinary self-control, mitigating his killing to manslaughter]), and Scott was confronted with considerably more than the mere departure and infidelity of his wife. The law of provocation does not in any way mitigate Scott's criminal liability, which is not before us, but it does reflect the law's concession to human weakness under stressful conditions, a factor that is as relevant to the fixing of an indeterminate sentence as to the determination of criminal liability. The Board's regulations acknowledge the relevance of this factor, as they provide that a prisoner's commission of a crime "as the result of significant stress in his life, especially if the stress has built over a long period of time," is a circumstance tending to show the prisoner is suitable for release. (§ 2402, subd. (d)(4).) The finding that Scott's motive was "very trivial in relationship to [his] offense" ignores not just the evidence that he was under significant stress when he committed his crime, but human nature and experience. Not even a "modicum of evidence" (*Rosenkrantz, supra*, 29 Cal.4th at p. 677) shows Scott's motive for killing Bradford is less significant or important than others which account for the commission of second degree murder, and that his release would therefore pose a greater threat to society than the release of most life prisoners. To permit Scott's motive to be used to deny him release would allow almost any motive to be used to deny a prisoner release, making a mockery of the legislative declaration that life prisoners are "normally" entitled to receive a release date shortly before they first become eligible for parole. (Pen. Code, § 3041, subd. (a).)

For the foregoing reasons, the evidence does not show the presence of any of the three factors the Board rested on in determining that Scott committed his offense "in an especially heinous, atrocious or cruel manner," the first of

---

is not truly related to the amount of money involved but to the question of who is dominant. . . . Many men, in particular, validate (or test their strength) by killing an opponent and gaining a sense of power in a world in which they feel they have no power at all. Killing compensates some people for their constant feeling of helplessness and powerlessness and at least once in their lives makes them, the killers, the boss over life and death." (Falk, Murder: An Analysis of its Forms, Conditions, and Causes (1990) p. 49.) Murdering someone for 40 cents can certainly be said to be "very trivial in relationship to the offense" but the underlying sentiment, which may be more genuinely at work, is not so easily classified.

the two circumstances the Board relied upon to find Scott unsuitable for release.[14]

## V.

### *There Is Not "Some Evidence" Scott Has an Unstable Social History*

Nor is there evidence showing Scott "has a history of unstable or tumultuous relationships with others" (§ 2402, subd. (c)(3)), the remaining circumstance

---

[14] Justice Haerle disagrees (conc. & dis. opn., *post*, at pp. 900–903). He believes the Board permissibly concluded Scott committed his offense "in an especially heinous, atrocious or cruel manner" because there was "some evidence" he committed his crime in a "dispassionate and calculated manner" and his motive for the crime was "very trivial in relationship to the offense." Justice Haerle finds the necessary evidence in (1) a sentence in the probation report that a single unidentified witness "reported that he had seen [Scott] hiding at the top of some stairs nearby"; (2) the fact that Scott shot his victim two or three times and did so in front of his wife and son; (3) that for 10 years prior to the shooting, Scott carried a weapon without a permit; (4) that Scott had numerous altercations with his wife during the period of her relationship with Bradford; (5) that Scott acted with "malice aforethought"; and (6) that the trial judge exercised discretion to enhance Scott's sentence for his use of a firearm. (Conc. & dis. opn., *post*, p. 901.)

First of all, the foregoing factors all relate to the manner in which Scott committed his offense; none relate to his motive.

Justice Haerle finds the fact that Scott's offense involved "malice aforethought" particularly indicative that he acted in a "dispassionate and calculated manner," although the Board never drew that conclusion. Most life prisoners committed homicide with "malice aforethought" and, on Justice Haerle's reasoning, that factor could almost always provide a basis upon which to deny parole, which would, of course, conflict with the statutory directive that a release date shall "normally" be set for life prisoners shortly before they become eligible for parole. (Pen. Code, § 3041, subd. (a).) The phrase "malice aforethought" is generally thought unamenable to precise definition (see, e.g., *People v. Miceli* (1951) 101 Cal.App.2d 643, 650 [226 P.2d 14]), other than that it " 'is manifested by the doing of an unlawful or felonious act intentionally and without legal cause or excuse.' " (1 Witkin & Epstein, Cal. Criminal Law, *supra*, Crimes Against the Person, § 165, p. 779, quoting *People v. Fallon* (1906) 149 Cal. 287, 289, 86 P. 689.) To say that the fact that an offense was committed with "malice aforethought" indicates it was carried out "in a dispassionate and calculated manner, such as an execution-style murder" seems to us manifestly untenable.

The hearsay statement of a single unidentified witness that Scott was hiding in a nearby stairwell was obviously rejected or discounted by the jury, as it explicitly found Scott did *not* premeditate or deliberate. (And, in any case, the fact that a murder was premeditated and deliberate does not tend to show it was "carried out in a dispassionate and calculated manner, such as an execution-style murder." (§ 2402, subd. (c)(1)(B).) If it did, few life prisoners would be released on parole.)

The facts that Scott shot his victim two or three times and in the presence of others, had no permit for the firearm he used, and that his sentence was enhanced for use of that firearm, simply fail to render this case significantly different from conventional second degree murders.

The fact that Scott previously had altercations with his wife (during the period of her addiction and infidelity) is entirely unrelated to the manner in which he carried out the commitment offense; the Board relied on that factor to show Scott had an unstable social history, which Justice Haerle agrees is unsustainable.

relied upon by the Board to deny him a parole release date. Indeed, the relevant evidence uniformly shows a notably stable social history.

The most comprehensive evaluation of Scott's relationships with others, which, again, is uncontradicted, is Dr. Donoviel's report. Dr. Donoviel relates at considerable length that Scott has no history of developmental problems, an exemplary family history except during the relatively brief period in which his wife was drug addicted, no history of substance abuse, no medical or psychiatric problems, other than the brief "adjustment disorder" occasioned by his wife's addiction, an excellent employment history, and no arrests or charges other than those stemming from the instant offense. "[T]here has been no indication of aggressive or violent behavior since [Scott's] incarceration and there were no indications for any such behavior in the first 45 years of his life." During his incarceration, Scott "interacts with all those he is in contact with in a respectful and appropriate fashion." Because of his "prosocial crime free history until the instant offense," Dr. Donoviel believes Scott "offers positive prognosis for living in the community." These statements are echoed or explicitly confirmed by every other evaluation of Scott in the record and uncontradicted by any other evidence before us. The record does not show Scott has ever had an "unstable or tumultuous" relationship with anyone other than the victim of his offense and his wife during the period of her addiction and infidelity. As Dr. Clair stated, "no findings either in the history or interview behavior . . . suggest that [Scott] might be subject to any form of thinking disorder or major affective disorder[, and, as] this implies, there are no current treatment needs." Like Dr. Donoviel, Dr. Clair emphasized, "[t]his inmate has a life totally free of violence apart from the era in which his marriage was falling apart." Drs. Donoviel and Clair both also noted that, as Dr. Donoviel stated, "Mr. Scott has involved himself with a variety of self help programs[, which] appear to have provided him with considerable insight into alternative ways of dealing with [the] type of situation that he was confronted with," as well as the impact of his actions on others. Numerous other reports and evaluations of Scott confirm the foregoing assessments. To take just one example, the 1997 report of a correctional counselor who had observed Scott for nearly a decade declares that "his conduct and demeanor has always been exceptional. I observed his day to day interaction with staff and inmates, and he always displayed the highest degree of respect and cooperation."

The Board finding that Scott "has a history of unstable or tumultuous relationships with others" is overwhelmingly refuted by all relevant evidence. Nor does the record provide any support for the Board's conclusion that Scott "needs [further] therapy in order to face, discuss, understand, and cope with stress in a non-destructive manner" and, "[u]ntil progress is made, the prisoner continues to be unpredictable and a threat to others." This finding is as bereft of factual support as the similar finding in *Ramirez, supra,* 94

Cal.App.4th 549 , described by that court as "an affront not only to Ramirez, whose progress in therapy was undisputedly exemplary, but also to the Department of Corrections, which provided the therapeutic programs and found Ramirez's participation in them to be outstanding." (*Id.* at p. 571.)

Examined in light of the record, the Board's explanation of why Scott is not suitable for release from prison is revealed as no more than the mouthing of conclusionary words. The reliable factual underpinning that is constitutionally required cannot be shown (see *McQuillion v. Duncan* (9th Cir. 2002) 306 F.3d 895, 902; *In re Caswell* (2001) 92 Cal.App.4th 1017, 1027 [112 Cal.Rptr.2d 462]), even under the exceptionally deferential standard of review we apply.

## VI.

### *The Board Failed to Consider Substantial Evidence Showing Scott Suitable for Release from Prison*

In addition to circumstances tending to show unsuitability for release from prison, Board regulations also describe nine circumstances tending to show an inmate suitable for release, stating that "the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." (§ 2402, subd. (d).) The specified circumstances are: "(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims. [¶] (2) Stable Social History. The prisoner has experienced reasonably stable relationships with others. [¶] (3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense. [¶] (4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time. [¶] (5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization. [¶] (6) Lack of Criminal History. The prisoner lacks any significant history of violent crime. [¶] (7) Age. The prisoner's present age reduces the probability of recidivism. [¶] (8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release. [¶] (9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release." (§ 2402, subd. (d)(1)–(9).)

■ Undisputed evidence demonstrates the existence in this case of all of the foregoing circumstances—except, of course, that relating to battered woman syndrome. The Board referred to some of them—the facts that Scott "has been disciplinary-free" in prison, obtained a marketable skill, has "participate[d] in self-help programs" and "has a favorable psychiatric report," but failed to take into account that he has "no juvenile record," a "stable social history," showed "signs of remorse," committed his offense "as the result of significant stress in his life," "lacks any significant history of violent crime," that his "age reduces the probability of recidivism," and that he "has made realistic plans for release." The Board's failure to undertake the "individualized consideration of all relevant factors" required by *Rosenkrantz, supra,* 29 Cal.4th at page 655, also offends the Board's own regulations, which require that "[*a*]*ll* relevant, reliable information available to the panel *shall be considered* in determining suitability for parole." (§ 2402, subd. (b), italics added.)

In *Ramirez, supra,* 94 Cal.App.4th 549, Division Three of this court noted "that while the Board 'commended' Ramirez for 'doing very well' in custody, its decision failed to reflect consideration of Ramirez's institutional behavior *as a circumstance tending to show his suitability for parole.* This is a factor the Board is required to consider under the regulations. [Citations.] Ramirez's outstanding performance in custody was amply supported by the record. While the Board need not recite every factor it considers in a parole hearing, particularly those it finds unpersuasive, its failure to acknowledge that Ramirez's conduct in prison was a circumstance that supported his application is yet another indication of an arbitrary and capricious determination." (*Id.* at pp. 571–572.) The Board's treatment of Scott is, if anything, more unfair than that condemned in *Ramirez,* because more evidence of circumstances tending to show suitability for release was ignored here than in that case.

■ The exceedingly deferential nature of the "some evidence" standard of judicial review set forth in *Rosenkrantz, supra,* 29 Cal.4th 616, does not convert a court reviewing the denial of parole into a potted plant. As the Supreme Court stated, "the requirement of procedural due process embodied in the California Constitution (Cal. Const., art. I, § 7, subd. (a)) places some limitations upon the broad discretionary authority of the Board" (*Rosenkrantz,* at p. 655), and federal courts have reached the same conclusion in respect of rights granted prisoners under the United States Constitution

(see, e.g., *Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910, 915). Not only must the denial of parole be based on " 'some evidence' " but, additionally, such evidence " 'must have some indicia of reliability.' " (*Ibid.*, quoting *Jancsek v. Oregon Bd. of Parole* (9th Cir. 1987) 833 F.2d 1389, 1390.)

██ Reviewing the record before us with great care, we conclude not simply that the evidence refutes rather supports the findings relied upon by the Board to deny Scott parole, but also that the Board has inexplicably and unjustifiably ignored abundant undisputed evidence showing him suitable for release. In cases such as this, a reviewing court is precluded from independently resolving conflicts in the evidence, determining the weight to be given the evidence, or deciding the manner in which the specified factors relevant to parole suitability are to be considered and balanced, because these are matters exclusively within the discretion of the Board. Indeed, "[i]t is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole." (*Rosenkrantz, supra*, 29 Cal.4th at p. 677.) The gravamen of our analysis is not that the evidence Scott is suitable for parole outweighs that showing him unsuitable, *but that there is no evidence he is unsuitable,* not even the "modicum" required by *Rosenkrantz, supra*, 29 Cal.4th at page 677. The denial of parole in this case is no more than an ipse dixit; the hearing was a sham. Scott's application for release clearly did not receive the "individualized consideration" to which he is constitutionally entitled. (*Id.* at p. 683.)

## DISPOSITION

The petition for writ of habeas corpus is granted. The Board is ordered to vacate the denial of parole and to conduct a new parole suitability hearing for Scott no later than the currently scheduled hearing date, July 20, 2004. At that hearing, the Board shall consider all of the psychological evaluations made of Scott since 1999 as favoring his application for a parole date. The Board shall also consider evidence of all relevant circumstances identified in its own regulations as tending to show a prisoner suitable for release from prison.

Lambden, J., concurred.

**HAERLE, J.,** Concurring and Dissenting.—I concur with much, but respectfully dissent from some, of the majority's opinion.

First of all, I concur with parts V. and VI. of the majority opinion, holding (1) that there was not "some evidence" (*In re Rosenkrantz* (2002) 29 Cal.4th

616, 658 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*)) that petitioner (hereafter Scott) has an unstable social history and (2) that the Board of Prison Terms (Board) failed to consider substantial evidence that Scott was suitable for release from prison. (Maj. opn. at pp. 895–899.)

Where I dissent from the majority is regarding its part IV., in which it holds that "[t]he record contains no evidence supporting" the Board's finding that Scott's murder of the victim falls within California Code of Regulations, title 15, section 2402, subdivision (c)(1).[1] (Maj. opn., *ante*, at p. 43.) That regulation provides: "The following circumstances each tend to indicate unsuitability for release. . . . [¶] (1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include: [¶] . . . [¶] (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder. [¶] . . . [¶] (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. [¶] (E) The motive for the crime is inexplicable or very trivial in relation to the offense." (§ 2402, subd. (c)(1)(B) , (D), (E).)

Especially because of our extremely limited "some evidence" standard of review, I simply disagree with the majority's conclusion that there is "no evidence" supporting any of this part of the Board's findings. Before getting into what that evidence is, however, a word is in order about our standard of review.

It is as clear as it could possibly be that our Supreme Court, in enunciating the "some evidence" standard in cases of this sort, intended to restrain trial and appellate courts from becoming regular, everyday appellate bodies to and regarding the Board. Indeed, just a few pages before articulating the "some evidence" standard of review, the *Rosenkrantz* court noted that in one of its prior decisions it had held that " '[t]he [Board's] discretion in parole matters has been described as "great" [citation] and "almost unlimited" [citation].' " (*Rosenkrantz, supra,* 29 Cal.4th at p. 655, citing *In re Powell* (1988) 45 Cal.3d 894, 902 [248 Cal.Rptr. 431, 755 P.2d 881].) It then went on to hold: "[W]e conclude that the judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure that the decision comports with the requirements of due process of law, but

---

[1] All further unspecified section references are to title 15 of the California Code of Regulations.

that in conducting such a review, the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation." (*Rosenkrantz*, at p. 658.) And still later in its decision, the court defined "some evidence" as follows: "Only a modicum of evidence is required." (*Id.* at p. 677.)

Based on that standard of review—and not, as I will later note, on my personal agreement with the outcome of the Board's deliberations and decision—I simply disagree with the majority's conclusion that there was no evidence to support the Board's decision. I think there was, and specifically as regards subparagraphs (B) and (E) of section 2402, subdivision (c)(1), quoted above.[2] In my opinion, in this case those circumstances included these facts revealed by the record both before the Board and us:

1. There was apparently testimony at the 1986 jury trial of Scott that, before shooting the victim, Scott had been "hiding in the stairway" of a nearby building watching the victim, Scott's wife, and Scott's 13-year old son as they, in turn, were apparently watching Fourth of July fireworks;

2. Scott shot the victim two or three times and did so in front of not only his wife, but their 13-year old son;

3. Scott had, for 10 years prior to the shooting, been carrying the gun he used to kill the victim without a permit;

4. Because of Scott's wife's relationship with the victim, and the drug use apparently deriving therefrom, Scott had previously slapped his wife, drawing blood; violated at least one court restraining order regarding contact with her; and had previously rammed a car containing his wife and the victim.

5. As a result of the testimony it heard about the crime, the jury which originally heard the case convicted Scott of first degree murder (apparently based on some sort of felony-murder theory) which, as defined in Penal Code section 187, includes the factor of "malice aforethought." (Pen. Code, § 187, subd. (a).)

6. After the conviction had been reentered as one for second degree murder, the trial judge who heard the matter exercised his or her discretion to add a two-year gun use enhancement to Scott's sentence.

---

[2] Put another way, I do not think there was "some evidence" supporting the Board's reliance on section 2402, subdivision (c)(1)(D), the subparagraph which states: "The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering."

Specifically as regards these six considerations, I think as least two of them constitute "some evidence" that the "offense was carried out in a dispassionate and calculated manner." (§ 2402, subd. (c)(1)(B).) Those two are: (1) the conviction was for an offense which, as just noted, requires "malice aforethought" and (2) there was testimony before the jury that Scott was "hiding in the stairway" before the shooting.[3]

I also think the background of this case satisfies the "some evidence" standard for the "very trivial in relationship to the offense" standard in section 2402, subdivision (c)(1)(E) of the Board's regulations. The majority stresses, repeatedly, the awful conduct of the victim in seducing Scott's wife, in inducing her to use drugs and to steal funds therefore from the Scott's business, etc., etc. *Of course*, that behavior was despicable and *of course* Scott was understandably tormented by it and its impact on his entire family. But the offense we are talking about here is murder and I think the Board could reasonably have found that the motive of anger over the victim's seduction of his wife and getting her hooked on drugs was trivial *in relationship to the offense of killing the victim.*

The majority, in frankly the least convincing part of its opinion, effectively substitutes its opinion for that of the Board, and does so by the tactic of setting up a patently false premise, to wit: "The reference in Board regulations to motives that are 'very trivial in relationship to the offense' therefore requires comparisons; to fit the regulatory description, the motive must be materially less significant (or more 'trivial') than those which conventionally drive people to commit the offense in question . . . ." (Maj. opn., *ante*, at p. 893.) This requirement of comparisons with other second degree murders is, purely and simply, an invention out of the proverbial whole cloth. Not a sentence, not a phrase, not a word in the Board's regulations suggests that, at the parole-eligibility stage, the motives underlying Penal Code section 187 convictions are, much less should be, subject to any sort of comparison test. But such is what the majority then embarks on—complete with quotations from several abstract academic musings regarding criminal motive. It concludes that the Board erred in finding that "Scott's motive for killing Bradford is less significant or important than others which account for the commission of second degree murder . . . ." (Maj. opn., *ante*, at p. 894.)

The majority's discursive venture into the exquisitely abstruse issue of comparative second degree murder motivations ignores the real issue. The

---

[3] The majority discounts this factor, apparently not even according it the "modicum of evidence" (*Rosenkrantz, supra,* 29 Cal.4th at p. 677) label on the completely speculative ground that the jury "obviously rejected or discounted" it. (Maj. opn., *ante*, at p. 895, fn. 14) In so stating, the majority ignores the fact that this evidence was specifically noted in Scott's postverdict probation report.

only comparison the Board was making, or indeed was entitled to make, was that Scott's motive for his actions was "trivial" in relationship to the crime which resulted, i.e., the murder of Bradford. I believe there is clearly a "modicum of evidence" (*Rosenkrantz, supra,* 29 Cal.4th at p. 677) supporting this conclusion. Thus, the Board could well have concluded—as I surely do—that there were an infinite variety of actions short of murder which Scott could have taken to diminish, deflect, defeat or even punish the victim's despicable conduct short of murder. Some of them are obvious: persistent attempts to induce law enforcement to investigate and prosecute the victim and his drug involvement; private investigations by licensed agents; civil litigation; consulting juvenile authorities (bearing in mind the proximity of all of this to the couple's children), and on and on. Indeed, even hitting the victim over the head with a baseball bat would have been infinitely preferable—and infinitely more defensible—to Scott's ultimate action here.

In short, the sort of despicable conduct toward one's family such as that involved here can justifiably provoke intense anger and, surely, strong action triggered by that anger. But, in my opinion, that tautology does not make it inexplicable or inappropriate for a parole Board to conclude that, on the facts of this case, the motivation for the crime was "trivial" in relationship to murder with "malice aforethought."

When all is said and done, part IV. (especially parts IV.A. and VI.C.) of the majority's opinion is nothing more than an elongated treatise on why my colleagues, if *they* had been on the Board, would have decided Scott's parole application differently. Well, I suspect I would have, too. But that is not the standard of review with which our Supreme Court has entrusted us. We are supposed to accord the Board " 'almost unlimited' " discretion and not subject its rulings " 'to second-guessing upon review.' " (*Rosenkrantz, supra,* 29 Cal.4th at pp. 655–656, citing *In re Powell, supra,* 45 Cal.3d at pp. 902, 904.) But "second guessing" is, I submit, precisely what the majority engages in here.

I have thus made clear my substantial disagreement with the majority's part IV. analysis, particularly as it relates to whether there was "some evidence" to support the Board's conclusions regarding section 2402, subdivision (c)(1)(B) and (E) of the regulations. But, I am also not terribly impressed with how the Board has handled this matter, particularly with regard to the issues dealt with by the majority in parts V. and VI. of its opinion. I very much hope the Board decides matters differently at its next hearing involving Scott, now scheduled for July 20, 2004.

A petition for a rehearing was denied July 22, 2004, and petitioner's petition for review by the Supreme Court was denied October 13, 2004.