[No. B207324. Second Dist., Div. Six. Feb. 18, 2009.]

In re LINDA LEE SMITH on Habeas Corpus.

Counsel

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Kim Aarons, Deputy Attorney General, for Appellant State of California.

Munger, Tolles & Olson, Blanca F. Young and Hailyn J. Chen for Respondent Linda Lee Smith.

Opinion

YEGAN, Acting P. J.—Governor Arnold Schwarzenegger appeals from the superior court's order granting respondent Linda Lee Smith's petition for writ of habeas corpus and vacating the Governor's decision to reverse the Board of Parole Hearings's determination that she is suitable for parole. (Pen. Code, § 1507.) We reverse the superior court's order because some evidence supports the Governor's conclusion that respondent is unsuitable for parole because she is currently dangerous. That evidence consists of (1) the aggravated circumstances of the commitment offense, and (2) respondent's lack of insight into her criminal behavior and failure to take responsibility for her past violent conduct.

*Factual and Procedural Background*

In 1980 respondent was convicted by a jury of second degree murder. Our Supreme Court reversed the conviction because the trial court had erroneously given a felony-murder instruction. (*People v. Smith* (1984) 35 Cal.3d 798, 801, 808 [201 Cal.Rptr. 311, 678 P.2d 886].) In its opinion, the Supreme Court summarized the facts as follows:

"[Respondent] and her two daughters, three-and-a-half-year-old Bethany (Beth) and two-year-old Amy, lived with David Foster. On the day Amy died, she refused to sit on the couch instead of the floor to eat a snack. [Respondent] became angry, took Amy into the children's bedroom, spanked her and slapped her in the face. Amy then went towards the corner of the bedroom which was often used for discipline; [respondent] hit her repeatedly, knocking her to the floor. Foster then apparently joined [respondent] to 'assist' in Amy's discipline. Beth testified that both Foster and [respondent] were striking Amy, who at that point had been at least partially undressed by [respondent]. [Respondent] and Foster used both their hands and a paddle on the child, and were also biting her. In addition, Beth testified that Foster put a wastebasket on Amy's head and hit her on the head with his fist. Eventually,

[respondent] knocked the child backwards and she fell, hitting her head on the closet door.

"Amy stiffened and went into respiratory arrest. [Respondent] and Foster took her to the hospital, where [respondent] admitted that she 'beat her too hard.' She also stated that Foster had not come home until after the incident. Amy died that evening. Her injuries were consistent with compressive force caused by numerous blows by hands, fists, and a paddle. The severe head injury that was the direct cause of death occurred within an hour before the child was brought to the hospital.

"[Respondent] testified that although she had spanked Amy on the day in question, she then left Amy in the children's room. Foster, believing additional discipline was warranted, went into the room, closed the door and began shouting at Amy. Although [respondent] heard thumping noises, she was not overly concerned because Foster had behaved similarly in the past and Amy had not been injured. After a half hour, [respondent] became somewhat worried and entered the room. She observed that Amy had a puffy lip, and bite marks and bruises all over her lower body. Foster left the room at [respondent's] request after [respondent] said she would continue the discipline. [Respondent] then shouted at Amy for 15 to 20 minutes to allow Foster time to 'cool off.' To avoid the possibility that Foster might also attack Beth, she took Beth into another bedroom and closed the door. Foster returned to the children's room and began slapping Amy because she would not look at him. [Respondent] testified she was afraid that if she interfered she would become the object of Foster's attack. She stated that although she realized that Amy was being abused, she did not believe the child's life was in danger. [Respondent] eventually did intervene, at which point Amy stiffened and fainted. [Respondent] expressed a desire to take the child to hospital, but Foster objected because of his concern about the possible effect on his probation status. [Respondent] therefore agreed to take all responsibility for Amy's injuries and initially did so in her statement at the hospital. As noted above, however, [respondent] later denied any active involvement in the beating that led to Amy's death." (*People v. Smith, supra*, 35 Cal.3d at pp. 801–802, fn. omitted.)

Following retrial, a jury again convicted respondent of second degree murder. She was sentenced to prison for 15 years to life.

At a parole consideration hearing, conducted in March 2006, the Board of Parole Hearings (Board) decided for the seventh time that respondent should be granted parole.[1] For the seventh time, the Governor reversed the Board's decision.

At the March 2006 hearing as well as prior parole consideration hearings, respondent's version of events was as follows: The beating was triggered by an incident during which Amy "cried because the pet duck wanted to eat her pancake and she refused to get up on the couch where the duck couldn't reach the pancake." Respondent did not participate in the beating. All of the blows were struck by Foster. Nor did respondent bite Amy: "I did not make those bite marks, I did not beat her." Earlier that day, respondent had merely spanked Amy on the buttocks with her hand and "a hollow, lightweight" plastic paddle. Nevertheless, respondent accepted responsibility for Amy's death because she had failed to protect her from Foster's physical abuse.

At a parole consideration hearing conducted in October 2002, respondent said that, following her arrest, she had made "a very long confession" to the police. That confession was the basis for the Supreme Court's statement of facts portraying her as the initiator and chief perpetrator of the violent acts committed against Amy. Respondent explained that she had made the confession because she had told Foster that she would take the blame and because she "was finally trying to protect [her] children." A commissioner asked her why he should believe her present version of events instead of her confession. Respondent replied: "Because I'm telling you the truth to the best of my ability. . . . I know, in my heart of heart, I did not inflict the blows that cost Amy her life. But I also know, in my heart of heart, I didn't stop it either."

Respondent's most recent psychological evaluation, dated January 23, 2006, noted: "[Respondent] states that she has no intention to minimize her responsibility for Amy's death, but she is clear in her assertion that she did not inflict any harm on Amy leading to the child's death on the day [the] incident occurred." "[Respondent] accepts full responsibility for the death of her daughter because she believes that she should have protected her children by ending the relationship with David [Foster] once she realized that he was abusive and harmful toward her daughters."

In reviewing the Board's decision to grant parole, the Governor observed that a number of factors supported respondent's release from prison: "[She] had no documented history of assaultive or violent behavior, or any criminal

---

[1] "The Board of Parole Hearings replaced the Board of Prison Terms in July 2005. (Pen. Code, § 5075, subd. (a).) For ease of reference, and because both entities have performed the same duties, we refer to both as 'the Board.' " (*In re Lawrence* (2008) 44 Cal.4th 1181, 1190, fn. 1 [82 Cal.Rptr.3d 169, 190 P.3d 535].)

record at all, when Amy was murdered. And since her incarceration, she has maintained a discipline-free conduct record and continues to enhance her ability to function within the law upon release. She has bettered herself educationally by earning a college degree and pursuing a Masters in Divinity. She recently completed a vocational graphic-arts program, has held skilled institutional jobs, has taken part in extracurricular activities, and has availed herself of an array of self-help and therapy over the years, including psychotherapy groups, 12-step Christian Codependency Program, Victim Impact Orientation Program, Issues with Children Group, Peer-helpers Group, Parenting Program, and Substance Abuse Training. Likewise, she has received positive evaluations from various mental-health and correctional professionals, and despite her past experiences with rocky and failed relationships, has been able to establish and maintain some supportive ties with family, including her surviving daughter, and others. She has also made confirmed parole plans in San Luis Obispo County, her county of last residence, that including [sic] living arrangements with her parents and two job offers, both performing clerical duties."

But the Governor declared that, "despite any factors currently tending to support [respondent's] parole suitability, she committed one of the most grisly crimes imaginable—she abused her helpless, two-year-old daughter and allowed her boyfriend to do the same." The Governor went on to state: "The torture and torment inflicted upon Amy was sickening. . . . Amy's battered body had damage and swelling on her head, bruises on her back, chest, and neck, scratch marks extending from her ear to her shoulders, bite marks on her buttocks, thighs, calves and feet, and severe damage to her eardrums consistent with a pail being placed over her head and struck. The nature and circumstances of this crime are enough for me to conclude again this year that [respondent's] release from prison would pose an unreasonable public-safety risk. Likewise, the reason for Amy's 'punishment'—her failure to sit in the right place and her decision to feed a pancake to her pet duck—is so exceedingly trivial that it makes the already deplorable and especially heinous crime for which [respondent] was convicted that much more atrocious and vile." The Governor noted that the walls of Amy's bedroom had been spattered with blood, that "[a]n autopsy [had] revealed more than 80 injuries on Amy's tiny body," and that respondent had told the police that the abuse of Amy had "lasted 'oh, about a half-hour or 45 minutes.' "

The nature and circumstances of respondent's crime were not the only reason why the Governor found her unsuitable for parole. The Governor also considered respondent's refusal to acknowledge her participation in the beating: "[Respondent's] role in Amy's murder was significantly more than just standing by and allowing it to happen. . . . [¶] . . . [Respondent] continues to believe that she carries a reduced culpability for this murder because her abuse of Amy perhaps was not administered as forcefully as her

boyfriend's or maybe did not last as long. What matters, and what [respondent] apparently remains unable or unwilling to fully grasp, is that she abused Amy—and then Amy died. Notably, the 2006 Board did not address or make any findings concerning whether [respondent] appreciates the nature and magnitude of her actions or is remorseful [for] what she did to Amy."

The Governor, therefore, concluded that "the factors weighing against [respondent's] parole suitability continue to outweigh, even after being incarcerated for more than 26 years, the positive ones supporting her release." Because respondent "would pose an unreasonable risk of danger to society if paroled at this time," the Governor reversed the Board's decision finding her suitable for parole.

### Standard of Review

"[T]he Governor undertakes an independent, de novo review of the inmate's suitability for parole [citation]." (*In re Lawrence, supra*, 44 Cal.4th at p. 1204.) The Governor "must consider all relevant statutory factors, including those that relate to postconviction conduct and rehabilitation. [Citation.]" (*Id.*, at p. 1219.)

In reviewing the Governor's decision to reverse the Board's determination that an inmate is suitable for parole, the standard of review is "whether 'some evidence' supports the conclusion that the inmate is unsuitable for parole because he or she currently is dangerous." (*In re Lawrence, supra*, 44 Cal.4th at p. 1191.) "[A]lthough . . . the Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety." (*Id.*, at p. 1214.)

### Some Evidence Supports the Conclusion That Respondent Is Unsuitable for Parole Because She Is Currently Dangerous

Based on *In re Shaputis* (2008) 44 Cal.4th 1241 [82 Cal.Rptr.3d 213, 190 P.3d 573] (*Shaputis*), we conclude that some evidence supports the Governor's conclusion that respondent is unsuitable for parole because she is currently dangerous. Shaputis killed his wife by shooting her in the neck at close range. He was convicted of second degree murder and sentenced to prison for 15 years to life. The Board found Shaputis suitable for parole and set a parole date.

The Governor reversed the Board's decision "because he concluded [Shaputis] posed an unreasonable risk of danger to society if released. The Governor's decision relied upon two grounds: (1) the crime was especially aggravated because it involved some premeditation, and (2) [Shaputis] had not fully accepted responsibility for, and lacked sufficient insight concerning, his conduct toward the victim." (*Shaputis, supra*, 44 Cal.4th at p. 1253.)

Our Supreme Court upheld the Governor's reversal "because of the aggravated circumstances of [Shaputis's] commitment offense and 'his lack of insight into the murder and the abuse of his wife and family.' " (*Shaputis, supra*, 44 Cal.4th at p. 1255.) Although the evidence indicated that Shaputis had intentionally killed his wife, he consistently claimed that the shooting was an accident. The Supreme Court concluded that "the Governor's reliance on [Shaputis's] lack of insight is amply supported by the record—both in [Shaputis's] own statements at his parole hearing characterizing the commitment offense as an accident and minimizing his responsibility for the years of violence he inflicted on his family, and in recent psychological evaluations noting [Shaputis's] reduced ability to achieve self-awareness." (*Id.*, at p. 1260, fn. 18.)

In reversing the Board's decision to grant respondent parole, the Governor here relied on grounds similar to those that he had relied on in *Shaputis*: (1) the aggravated circumstances of the crime, and (2) respondent's lack of insight into her conduct and refusal to accept responsibility for her participation in the beating of Amy. The circumstances of respondent's crime are far more aggravated than the circumstances of Shaputis's crime. Shaputis killed his wife by a single gunshot wound to the neck. According to respondent's confession and Bethany's testimony at the original trial, respondent personally attacked Amy over a period of 30 to 45 minutes. Amy must have suffered horribly during the attack, which was triggered by a trivial incident. Moreover, unlike Shaputis's wife, Amy was particularly vulnerable because she was only two years old.

■ Just as Shaputis insisted that the shooting of his wife was an accident, so has respondent continued to claim that she neither struck nor bit Amy. Respondent expressed remorse for not preventing Foster from beating Amy to death. She never expressed any remorse for her personal participation in that beating. Based on her confession and Bethany's testimony at the original trial, the Governor could have reasonably concluded that respondent had initiated the attack and had been the principal aggressor. The Governor was not required to accept respondent's version characterizing herself as a mere bystander to a beating perpetrated by Foster alone. Thus, as in *Shaputis*, the record supports the conclusion that respondent "has failed to gain insight or understanding into either [her] violent conduct or [her] commission of the commitment offense." (*Shaputis, supra*, 44 Cal.4th at p. 1260.)

In *Shaputis* our Supreme Court noted that "the Governor's decision is supported by some evidence—not merely because the crime was particularly egregious, but because [Shaputis's] failure to take full responsibility for past violence, and his lack of insight into his behavior, establish that the circumstances of [Shaputis's] crime and violent background *continue* to be probative to the issue of his *current* dangerousness." (*Shaputis, supra,* 44 Cal.4th at p. 1261, fn. 20.) The "violent background" referred to in this quotation consisted of Shaputis's "long history of domestic violence." (*Shaputis, supra,* 44 Cal.4th at p. 1253.) Unlike Shaputis, respondent does not have a violent background. The Governor observed that respondent "had no documented history of assaultive or violent behavior, or any criminal record at all, when Amy was murdered."

■ Respondent's lack of a violent background is not a valid distinction between the instant case and *Shaputis.* The gravity of respondent's commitment offense has continuing predictive value as to current dangerousness in view of her lack of insight into her behavior and refusal to accept responsibility for her personal participation in the beating of Amy. "[A]s established in . . . [*Shaputis*], . . . the Governor does not act arbitrarily or capriciously in reversing a grant of parole when evidence in the record supports the conclusion that the circumstances of the crime continue to be predictive of current dangerousness despite an inmate's discipline-free record during incarceration. As explained in detail in that case, where the record also contains evidence demonstrating that the inmate lacks insight into his or her commitment offense or previous acts of violence, even after rehabilitative programming tailored to addressing the issues that led to commission of the offense, the aggravated circumstances of the crime reliably may continue to predict current dangerousness even after many years of incarceration. [Citations.]" (*In re Lawrence, supra,* 44 Cal.4th at p. 1228.)

### Conclusion

When the Governor reverses a board's grant of parole, he sits as the trier of fact and may draw reasonable inferences from the evidence. (*In re Tripp* (2007) 150 Cal.App.4th 306, 312, 319 [58 Cal.Rptr.3d 64].) Both the superior court and the dissent draw inferences in favor of respondent and based thereon, conclude that she is not currently dangerous and should, therefore, be released. This is not their "call." Their conclusions are based upon a reweighing of the evidence. We do not abdicate our constitutional duty: we recognize that in an appropriate case, inferences drawn by the Governor may be unreasonable as a matter of law. That is not the case here. Were we lawfully to view this evidence on a de novo basis, we might well come to the same conclusion as the superior court and the dissent. But this is not the appropriate standard of review.

The order of the superior court is reversed.

Coffee, J., concurred.

**PERREN J.,** Dissenting.—I respectfully dissent.

Linda Smith has been in custody for 28 years. The crime that brought her to prison is the murder of her own child. Neither the Governor's recent reversal nor the majority's recitation of the facts want for adjectives in describing its commission. In reversing the Board of Parole Hearings (BPH), Governor Schwarzenegger found that Ms. Smith's inability or unwillingness "to fully grasp" that she abused her child, coupled with the facts attending the murder, led him to believe that she "would pose an unreasonable risk of danger to society if paroled."[1]

The record does not support the Governor's conclusion. To the contrary, the record shows that Ms. Smith is remorseful, understands her culpability, and that there is not "some evidence" to support the Governor's conclusion that, if released, Ms. Smith would "pose an unreasonable risk of danger to society." The overwhelming and indisputable evidence presented at the 2006 BPH hearing, including over 20 years of unanimous opinions of mental health experts, evidences the sincerity of Ms. Smith's remorse, her rehabilitation and her fitness for return to society. I therefore conclude that a review of Ms. Smith's impeccable performance in prison, her repeated confessions of guilt and remorse for the crime and the opinion of mental health experts that Ms. Smith's risk of recidivism is in the "Very Low" range,[2] lead to but one conclusion: That she "does not present a threat to public safety." Accordingly, I would grant the petition and reinstate the BPH's parole release order.

A review of a denial of parole, whether by the BPH or the Governor, starts with the statutory mandate that the BPH shall normally set a parole release date. (Pen. Code, § 3041, subd. (a);[3] *In re Lawrence* (2008) 44 Cal.4th 1181, 1212 [82 Cal.Rptr.3d 169, 190 P.3d 535].) The presumption is that parole *must* be granted unless *public* safety requires a lengthier period of incarceration. (*In re Shaputis* (2008) 44 Cal.4th 1241, 1257 [82 Cal.Rptr.3d 213, 190 P.3d 573].) "The Governor is subject to the same standards as those that apply to the Board." (*Id.*, at p. 1258.) In making the required analysis, both the Governor and the BPH apply the factors favoring and disfavoring suitability found in California Code of Regulations, title 15, section 2281, subdivisions (c) and (d). It is beyond dispute that Ms. Smith's performance in

---

[1] Indeterminate sentence parole release review and reversal dated July 25, 2006.

[2] Report of staff Psychologist Robert Smith dated January 23, 2006.

[3] All further statutory references are to the Penal Code unless otherwise specified.

prison has been remarkable. In fact, Ms. Smith has had nine parole dates set since 1995, the date when the release that had been scheduled for over four years was "reconsidered" but 33 days before her release. Since then she has been considered and recommended for parole seven times with a like number of gubernatorial reversals. The principal focus of these reversals has been the extreme (and immutable) severity of the offense. Yet, a fair reading of the factors to be considered in determining suitability favor her release.[4] More importantly, the application of these factors lead inexorably to the conclusion that Ms. Smith is suitable for parole because there is not some evidence that she is currently dangerous. (*In re Lawrence, supra*, 44 Cal.4th at p. 1191.)

The test for sustaining the Governor's finding is whether his conclusion is supported by "some evidence." This involves a two-step analysis. First, the suitability factors must be supported by some evidence. Second, if so, the ultimate question of the inmate's threat to public safety "must be supported by some *evidence*, not merely by a hunch or intuition." (*In re Lawrence, supra*, 44 Cal.4th at p. 1213.) In the present case the only suitability factors upon which the Governor relied were the nature of the commitment offense, his

---

[4] The suitability factors as set forth in California Code of Regulations, title 15, section 2281, subdivision (d) and their applicability are as follows: (1) She has neither a juvenile nor adult record except for the commitment offense. Her term of imprisonment is unblemished. (2) Her relationships within the institution are unique. She is a peer counselor and a spiritual counselor, and has been recognized for her service both by the California Institution for Women (CIW) and Chaffey College. (See letter from Rev. Theodore R. Johnson: "Linda is a faithful worker in the Protestant out-reach here at CIW and has been for a number of years. She has been a tremendous help to those less fortunate than herself, providing emotional support to new arrivals, to the general population, and to those seeking Christ. [¶] . . . But the reason I am writing this letter is to encourage you, the Board of Prison Terms, to send home the hardest worker I've seen in my eight-plus years at CIW as a Chaplain Volunteer.") In addition the record shows over 500 pages of letters from friends, family, community members and religious leaders sent over an 18-year period urging her release on parole. (3) Her signs of remorse will be addressed in the text. (4) and (5) The record is replete with evidence of her being abused by the codefendant David Foster. The Governor addresses the issue by discounting it since no finding was made by the BPH. (6) There is no other history of violence. (7) She is 54 and assessed as being in the "very low range" for recidivism. "If released to the community, I believe the inmate would continue to adhere to societal norms, rules, and regulations, and to the rights and feelings of others. The inmate continues to utilize her time in the service of others, and continues to develop greater skills in dealing an [*sic*] coping with stress. [¶] . . . I believe the risk factors involved in her crime are no longer evident. This individual is no longer emotionally unstable, either occupationally or socially, thus, these are no longer risk factors in my opinion." (Dr. Robert McDaniel, staff psychiatrist, Feb. 3, 2000.) A full HCR-20 risk assessment was performed by Dr. Robert Smith in August 2005: "A review of inmate Smith's static and dynamic risk factors suggests that the probability of future offenses if she were released from custody would probably fall below 5% over a three-year period. This means that fewer than five in every 100 women with similar risk factor loadings would be expected to commit an offense within three years after release." (8) She has offered detailed plans for her future upon release, including job offers. (Comments by presiding commissioner at 2006 BPH hearing.) (9) The record is replete with evidence of Ms. Smith's good works in the institution.

assessment of appellant's appreciation for the nature and magnitude of her conduct, her belief that she had reduced culpability for the murder, and his conclusion that she is not appropriately remorseful.

The indisputable conclusion that the commitment offense was carried out "in an especially heinous, atrocious or cruel manner" (Cal. Code Regs., tit. 15, § 2281, subd. (c)(1); *In re Lawrence, supra*, 44 Cal.4th at pp. 1202–1203, fn. 7), however, does not end the discussion. Rather, where the evidence of rehabilitation and suitability for parole "under the governing statutes and regulations is overwhelming," and the commitment offense is "both temporally remote and mitigated by circumstances indicating the conduct is unlikely to recur, the immutable circumstance that the commitment offense involved aggravated conduct does not provide 'some evidence' *inevitably* supporting the ultimate decision that the inmate remains a threat to public safety." (*Lawrence*, at p. 1191.) In its 2006 grant of parole, the BPH recognized this even prior to the Supreme Court's pronouncement. "[The] crime was, of course, horrific. However we could further describe that crime as ugly, horrendous. Whatever one might want to call it it's not going to change. Unfortunately, the victim is not going to return either. However, it is the same crime and will continue to be the same crime forever. The thing that has changed it would appear is that the inmate has changed. And consequently we believe that you have done a good job in making that change. . . . However the crime translated itself back so many years ago to today. It seems horrific then and it's horrific today. However you have changed and we believe that you are ready to go out and be a member of society again."[5]

What remains is the Governor's determination that Ms. Smith "remains unable or unwilling to fully grasp" that "she abused Amy—and then Amy died." A review of the record, however, discloses that every mental health professional and counselor who has dealt with her since 1986 has concluded otherwise. Representative examples include:

(1) Robert D. McDaniel, M.D., staff psychiatrist (Aug. 1995): "It is my professional opinion that Ms. Smith is not in denial regarding the seriousness of her crime, nor does anything suggest to me that [she] is avoiding responsibility."

(2) Dr. McDaniel (Dec. 1996): "Anyone who spends time with this individual will be impressed with the difference she is now, as opposed to what she was at the time of her crime. [¶] From a psychological perspective, I believe that she has dealt with issues of responsibility for the crime, has dealt with issues of remorse, and has purposefully, and in my opinion, fearlessly

---

[5] Transcript of 2006 BPH hearing, comments by Presiding Commissioner Inglee.

opened herself up to feel the hurt and pain that her crime has caused. From this standpoint, she has internalized societal norms and expectations and feels deeply for the situations of others."

(3) Peter Hu, M.D., staff psychiatrist (Aug. 2003): "In essence, the inmate was convicted of Second Degree Murder for the death of her child. Causative factors including relationship with a man who was by history violent and predatory in nature. The inmate has continued to demonstrate a significant level of insight in the mechanism of the crime and has demonstrated remorse and empathy for the victim."

(4) Robert Smith, Ph.D., staff psychologist (Oct. 2004): "She stated that her responsibility for Amy's death began when she did not terminate her relationship with David even after physical abuse was occurring in the home. Inmate Smith goes further to say that she personally failed in her responsibility to protect her own children from harm. She expressed genuine and deep remorse over Amy's death."[6]

(5) Dr. Smith (Jan. 2006): "Inmate Smith accepts full responsibility for the death of her daughter because she believes that she should have protected her children by ending the relationship with David once she realized that he was abusive and harmful toward her daughters. Inmate expresses insight, remorse, and sorrow over the death of her daughter." Dr. Smith continues: "She possesses a viable parole plan, and her remorse and regret are creditable and consistent over numerous prior evaluations."

Thus, where there is "unanimous clinical evidence" showing that the prisoner is not a danger to society and has insight and understanding of her behavior, neither the BPH nor the Governor has "some evidence" to find to the contrary. (*In re Roderick* (2007) 154 Cal.App.4th 242, 272 [65 Cal.Rptr.3d 16]; see also *In re Lawrence, supra*, 44 Cal.4th at pp. 1222–1223 [Governor's conclusion that petitioner showed insufficient remorse is unsupported when clearly contradicted by abundant evidence in the record].) This is just such a case.

---

[6] To give context and background to Dr. Smith's opinion the following excerpt is added: "I have had the opportunity to work around inmate Smith in the Special Care Unit and in other mental health delivery settings for more than five years, observing her role as an inmate assistant and witnessing her ability to treat mentally impaired and less fortunate inmates with courtesy and respect. Prior to that time, I had contact with inmate Smith in relation to her work teaching values education modules to other inmates in the Special Care Unit and in the general population, and I have observed her efforts to organize and carry out holiday celebrations for mentally disordered inmates. [¶] I share the Governor's concern for our community, and his desire to protect innocent victims from brutality. However, I regard inmate Smith as a transformed person who has considerable potential for social contributions in the community, should she obtain a release."

In discussing the facts of the case the majority suggest that Ms. Smith claims to not have struck her daughter and that the Governor could fairly conclude that Ms. Smith instigated the attack and was the principal aggressor. The record appears to the contrary. Ms. Smith testified at the 2006 hearing that she spanked her child· and that she struck her with a plastic paddle. Ms. Smith also testified that she was in the room during the beating. Although relying on the Supreme Court's recitation to set forth the facts of the case, the majority fail to mention the factual recounting in the opinion of this court following the retrial.[7] In that opinion there is no recounting that Amy's sister, Bethany, saw her mother strike Amy though she knew that both she and Foster were in the room and she heard Amy's anguish. In testimony before the BPH in 2004, Bethany, now Ms. McDermott, testified that she did not see her mother administer any blows to her sister. Of greater import, however, are Ms. McDermott's testimony and her letters to the BPH written in support of her mother. She accepts her mother's complicity but recognizes her mother's recovery: "[S]he was given a sentence 15 years to life, she has served that sentence responsibly. She has used the time and the resources available to her to improve herself, to help others, and to become the kind of person who would never let anything like this repeat, and she's become the kind of person I would want to have in my life and that I would choose to have around me."

The applicable analysis is summed up by the Supreme Court in *Lawrence*:

"As we explain below, an inquiry into whether the offense is more aggravated than the minimum elements necessary to sustain a conviction was not intended by this court to be the exclusive measure of due process, and has proved in practice to be unworkable, leading to arbitrary results. Most importantly, the circumstance that the offense is aggravated does not, in every case, provide evidence that the inmate is a current threat to public safety. Indeed, it is not the circumstance that the crime is particularly egregious that makes a prisoner unsuitable for parole—it is the implication concerning future dangerousness that derives from the prisoner having committed that crime. Because the parole decision represents a prospective view—essentially a prediction concerning the future—and reflects an uncertain conclusion, rarely (if ever) will the existence of a single isolated fact in the record, evaluated in a vacuum, suffice to support or refute that decision.

"Accordingly, we conclude that although the Board and the Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or

---

[7] (*People v. Smith* (Mar. 18, 1987, B011393) [nonpub. opn.].)

post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety." (*In re Lawrence, supra*, 44 Cal.4th at pp. 1213–1214.)

Application of these principles to the instant matter demonstrates that the decision of the trial court is entirely consistent with and predictive of the standards for reviewing a grant or denial of parole whether by the BPH or the Governor. Eligible for parole in 1990,[8] and given a parole date in 1995, Ms. Smith has now served 28 years in prison. Her performance has been exemplary and without incident. Ironically, in 2006, Governor Schwarzenegger best described her exceptional qualifications for parole:

"Ms. Smith had no documented history of assaultive or violent behavior, or any criminal record at all, when Amy was murdered. And since her incarceration, she has maintained a discipline-free conduct record and continues to enhance her ability to function within the law upon release. She has bettered herself educationally by earning a college degree and pursuing a Masters in Divinity. She recently completed a vocational graphic-arts program, has held skilled institutional jobs, has taken part in extracurricular activities, and has availed herself of an array of self-help and therapy over the years, including psychotherapy groups, 12-step Christian Codependency Program, Victim Impact Orientation Program, Issues with Children Group, Peer-helpers Group, Parenting Program, and Substance Abuse Training. Likewise, she has received positive evaluations from various mental-health and correctional professionals, and despite her past experiences with rocky and failed relationships, has been able to establish and maintain some supportive ties with family, including her surviving daughter, and others. She also has made confirmed parole plans in San Luis Obispo County, her county of last residence, that including [*sic*] living arrangements with her parents and two job offers, both performing clerical duties. All of these factors are supportive of Ms. Smith's release from prison to parole at this time."[9]

---

[8] BPH hearing March 3, 2006.

[9] Indeterminate sentence parole release review (§ 3041.2) July 25, 2006. (See also comments of Presiding Commissioner Angele at the 2004 BPH hearing: "The inmate has no juvenile record, while in prison has enhanced her ability to function within the law upon release, did participate in educational programs, self-help therapy and vocational programs, institutional job assignments, and voluntary assignments including but not limited to psychotherapy groups for lifers, walkathon, [her] involvement in the Christian carnival, mental health inmate assistance clerk, education clerk, Literacy Volunteers of America, records clerk, peer helper, peer counselor, Christian studies, Nonviolent Environmental program, and crochet project, interfaith chapel, assisting CCCMS and EOP programs, program inmates, MYRA, Renaissance Fair. She has received an AA degree and a Bachelor's degree and is currently working on a

The majority conclude that the Governor's decision to reverse the BPH's grant of parole is supported by "some evidence." In reaching this conclusion they rely upon *In re Shaputis, supra,* 44 Cal.4th 1241. Shaputis murdered his wife. He had a long and "sometimes violent criminal history," including charges of violent sex crimes against family members and charges of repeated driving under the influence offenses, all of which the Supreme Court recounts at length. (*Id.,* at p. 1248.) He had abused his first wife and his children from that marriage including jumping on his wife's stomach inducing a miscarriage. He held a knife to the throats of his daughters when they misbehaved. The marriage ended in divorce based on his abusive behavior. He beat the murder victim, his second wife, on many occasions over their 23-year marriage, once so severely that she required plastic surgery. Eighteen months before the crime, and during one bout of his chronic drinking, he shot at the victim. He had a history of chronic violence while drinking. *Shaputis* is inapposite. The Supreme Court explained: "This is not a case, like *Lawrence, supra,* 44 Cal.4th 1181, in which the commitment offense was an isolated incident, committed while petitioner was subject to emotional stress that was unusual or unlikely to recur. (See, e.g., [Cal. Code] Regs., [tit. 15] § 2402, subd. (d)(4) [the circumstance that the crime was committed during a period of significant stress in an inmate's life constitutes evidence to be considered in evaluating his or her suitability for parole].) Instead, the murder was the culmination of many years of petitioner's violent and brutalizing behavior toward the victim, his children, and his previous wife." (*In re Shaputis, supra,* at p. 1259.) Lawrence's emotional stress was the threat of the loss of her lover who threatened to return to his wife. (*In re Lawrence, supra,* 44 Cal.4th at pp. 1192–1193.) Ms. Smith was subjected to the brutality of the principal assailant in the murder of her daughter. In comparing and contrasting the precipitant factors resulting in these respective murders it seems clear that Ms. Smith's "emotional stress" was far greater and personally threatening than that of Ms. Lawrence.

*Lawrence* is controlling. A comparison of the facts and circumstances of the crimes committed by Ms. Lawrence and Ms. Smith and the subsequent performance of each while in prison, strongly suggests that this court should affirm the trial court's reversing of the Governor's decision. The circumstances attending each of the murders were abhorrent. But Ms. Smith took her victim to the hospital rather than fleeing for over a decade. Unlike Ms. Smith, Ms. Lawrence initially had problems at the inception of the 23 years she spent in prison including several instances of administrative violations for which she was counseled. Ms. Smith has served 28 years and received no disciplinary writeups. Ms. Lawrence was initially diagnosed as "narcissistic," and lacking in emotional insight. The examining

---

Master's degree. The inmate lacks a history of crime. She has no prior convictions or arrests emphasizing as a juvenile or an adult.")

psychologist characterized Ms. Lawrence "as 'explosive' and a 'high flight risk if she loses her appeal.' " (*In re Lawrence, supra,* 44 Cal.4th at p. 1194.) In denying her parole, the Governor specifically noted that though Ms. Lawrence's recent psychological reports were positive, "*early* prison reports by mental health evaluators characterized [her] as sociopathic, unstable, and moderately psychopathic." (*Id.,* at p. 1200.) No such entries appear in Ms. Smith's record. To the contrary, 22 years ago Dr. Cotter, the prison staff psychiatrist, opined, "When the time comes for her release on parole, I have confidence she will present no danger to society." Twenty years later, Dr. Smith stated, "There is no immediate threat of dangerousness, should this inmate be released to the community. The inmate is mentally stable, and there is no stated threat against persons or property in the community." The intervening entries by all prison staff substantiate these conclusions. Ms. Lawrence had four positive parole recommendations. Ms. Smith has had nine.

"Accordingly, under the circumstances of the present case—in which the record is replete with evidence establishing petitioner's rehabilitation, insight, remorse, and psychological health, and devoid of any evidence supporting a finding that she continues to pose a threat to public safety—petitioner's due process and statutory rights were violated by the Governor's reliance upon the immutable and unchangeable circumstances of her commitment offense in reversing the Board's decision to grant parole. Contrary to the assertion of the dissent, the Governor's action vacating the Board's grant of parole to petitioner runs contrary to both his statutory and his constitutional obligations. As set forth in detail above, both the governing statutes and constitutional due process principles require the Governor to base his decision to set aside a grant of parole on 'some evidence' of current dangerousness. The evidence relied upon by the Governor in this case—the egregiousness of the commitment offense—does not provide 'some evidence' that petitioner remains a current threat to public safety. Accordingly, the Governor's decision is not supported by 'some evidence' of current dangerousness and is properly set aside by this court." (*In re Lawrence, supra,* 44 Cal.4th at p. 1227.)

Placing the template of our Supreme Court's holding in *Lawrence* over the denial of parole in the instant matter should have led the majority to affirm the trial court's order. Though the standard of review is " 'exceeding deferential,' " such deference " 'does not convert a court reviewing the denial of parole into a potted plant.' " (*In re Lawrence, supra,* 44 Cal.4th at pp. 1211–1212, citing *In re Scott* (2004) 119 Cal.App.4th 871, 898 [15 Cal.Rptr.3d 32].) In addition to the aggravated circumstances of the commitment offense, parole cannot be denied, "unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the

commitment offense remain probative to the statutory determination of a continuing threat to public safety." (*Lawrence*, at p. 1214.) Refracted through the prism of this test it is clear that, absent mere hunch or intuition, Linda Lee Smith presents no current danger to public safety.

I would affirm.

Respondent's petition for review by the Supreme Court was denied June 24, 2009, S171561.