Filed 11/21/22  In re Hector R. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re HECTOR R. et al., Persons Coming Under the Juvenile Court Law. | B314373 (Los Angeles County Super. Ct. No. 21CCJP00669) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. JAMES R., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Lisa A. Brackelmanns, Judge Pro Tempore.  Affirmed.

Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Jane E. Kwon, Deputy County Counsel, for Plaintiff and Respondent.

––––––––––––––––––––

Father James R. (Father) appeals from the juvenile court's dispositional orders removing his young two sons, Hector R. and Jaden R.,[1] from his custody due to domestic violence between Father and mother, T.H. (Mother), and Father's sexual abuse of his five-year-old stepdaughter, L.H. We conclude substantial evidence supports the juvenile court's orders removing Father's sons from his custody and that no reasonable means existed to protect the children absent removal. Accordingly, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

**A.    The Family**

Father and Mother began dating in 2017 or 2018. They have two children together, Hector and Jaden, who, at the time of the Welfare and Institutions Code[2] section 300 petition in February 2021, were 22 months old and six months old, respectively. Mother also has two daughters from a relationship

––––––––––––––––––––

[1] The section 300 petitions refer to Jaden, but his name is spelled Jayden on the hospital's birth certificate.

[2] Subsequent unspecified statutory references are to the Welfare and Institutions Code.

2

with Jorge V.,[3] 11-year-old P.H. and five-year-old L.H.  Mother, Father, and the children lived together in Laughlin, Nevada, then in a shelter, and then in an apartment in Los Angeles County for which both Mother and Father were listed on the lease as tenants.  Only Hector and Jaden are subjects of this appeal.  Neither Mother nor Jorge is a party to this appeal.

## B.    Child Welfare History

In 2020, the Los Angeles County Department of Children and Family Services (DCFS) received three referrals involving Father.  In January 2020, a caller reported sexual abuse by Father.  The referral was evaluated out for investigation.  In July 2020, a caller reported Father allegedly sexually abused P.H.[4] That referral was closed as unfounded.  In September 2020, DCFS received a referral that P.H. intervened during an episode of domestic violence between Mother and Father.  The referral was closed as inconclusive.

## C.    Events Giving Rise to DCFS's Involvement

On February 3, 2021, DCFS received a referral that Father sexually abused L.H. "about two weeks ago and also in June or July of 2020 and August 2020."  Law enforcement brought L.H. to a clinic for forensic examination, during which L.H. was observed

---

[3] Jorge is a non-offending parent in these dependency proceedings.

[4] Based on DCFS's interviews during these proceedings, the July 2020 referral likely concerned L.H. and not P.H.

to have several bruises, including on her left hip and left mid-thigh, and brown spots indicating prior bruising.[5]

On February 4, 2021, Mother told a DCFS social worker that she and Father argued on February 3, 2021, regarding rent and disciplining the children. Father urged Mother to spank them; Mother told Father to leave. After he did so, Mother remembered her wallet was in his car. She claimed that Father refused to return it. Mother called the police and informed them of domestic violence between her and Father and that L.H. had told her that Father had touched her vagina.

1.    *Investigation of Domestic Violence*

During the social worker's February 4, 2021 interview of Mother, Mother confirmed that she and Father have a history of domestic violence and that since December 2020, they have had three physical altercations. During one altercation at the end of last year, P.H. intervened. She was not physically injured.

P.H. and the maternal grandmother also reported that five months before, when the family lived in a shelter, Mother and Father fought. The maternal grandmother reported that Father choked Mother and that P.H. had witnessed the incident.

Father stated that Mother hit him when they lived in the shelter. He claimed that when he stood up after Mother hit him, P.H. thought he was going to hit Mother, so P.H. grabbed a stick

---

[5] A DCFS social worker also observed brown marks on L.H.'s right knee, left outer thigh, and lower left side of the stomach. L.H. also had a greenish mark just below her hairline. L.H. denied being hit by anyone. Mother does not know the cause of L.H.'s bruises. She denied that any of the children were hit.

4

and came towards him. He took the stick from P.H. and left the shelter. He claimed that he never hit Mother and that Mother was always the aggressor.[6]

## 2. *Investigation of Sexual Abuse*

Mother, a victim of childhood sexual abuse by the maternal grandfather and maternal great grandfather, told a DCFS social worker that in "July/August 2020," L.H. told her that Father had touched her inappropriately. The results of a forensic sexual abuse exam conducted at the time at Olive View Medical Center were negative. As a result, both Mother and P.H. were not sure whether they believed L.H.'s allegations of sexual abuse. The social worker advised Mother that forensic examinations are not always able to confirm inappropriate sexual touching. Mother observed that the maternal grandmother "is always asking the girls if anyone is touching them inappropriately."

However, Mother recounted a recent incident that caused her to be concerned about L.H. She, Father, and L.H. went to a grocery store. While there, L.H. stated that Father promised to buy her an "LOL" toy during Christmas. Mother asked L.H. why Father had made that promise and observed Father had a serious look on his face. When L.H. saw the look on Father's face, she became quiet. Mother later asked L.H. if Father touched her; L.H. would not answer the question.

On February 3, Mother asked L.H. again if Father touched her. L.H. responded that Father rubbed her "private" with his fingers at Christmas time. Mother took L.H. to the hospital for

---

[6] Father also told the DCFS social worker that he had been in prison from 1998 to 2015 for voluntary manslaughter, possession of a firearm, and gang activity.

an examination, but ended it before the vaginal examination was completed because she felt it was invasive and that L.H. was nervous.

Mother reported that every other week since December 2020, L.H. has woken up with a bad dream. L.H. did not tell Mother what the dreams were about, but L.H. was afraid to sleep alone. In January 2021, Mother observed L.H. "grinding" on the sofa twice. Mother also reported that L.H. changes her underwear two to three times per day and states that she wants a boyfriend.

Mother also participated in a forensic interview on February 3, 2021. During the forensic interview, Mother stated L.H. said Father touched her at night, while L.H. was sleeping. Mother reported that L.H. shares a room and a bed with her little brother. According to P.H., L.H. does not sleep alone; she sleeps in the same room as Hector. When Father goes in to check on Hector, the door is always open, and Father stays in the room for only a couple of minutes.

The social worker asked L.H. if anyone touched her body on a place they are not supposed to. L.H. responded that Father did. When asked where he had touched her, L.H. pointed to her vagina. She stated that Father came into her room at night time and touched her under her pajamas and panties with his finger. She denied penetration and said Father touched her one time only. When asked if Father bought her anything, she stated he bought her an "LOL" toy, but did not know why he bought it.

A nurse practitioner reported to the social worker that L.H. had twice reported Father touched her inappropriately in the last year, although the nurse did not know if L.H. reported the same incident twice. She claimed it was Mother, not L.H., who was

6

nervous during L.H.'s February 3, 2021 examination. The nurse observed redness around L.H.'s genitals, but concluded it may or may not be abuse related.

The record includes notes, dated February 4, 2021, from a registered nurse that indicate L.H. told the nurse that Father touched under her clothes on her "private part" when he came in and told her "sweet dreams."

On February 5 and 6, 2021, the social worker interviewed Father by phone. He denied inappropriately touching L.H. He observed he is never alone with her; stated L.H. had acted inappropriately with him in front of Mother by attempting to hug and kiss him; and stated he bought her an "LOL" toy for Christmas and her birthday. Further, Father stated Mother, maternal grandmother, and maternal grandfather are "always" putting thoughts in the girls' heads about being touched inappropriately.

Maternal grandmother confirmed that she does ask the girls if they are being touched inappropriately. The girls have not disclosed any inappropriate touching to her.

On February 10, 2021, a social worker interviewed P.H. and L.H.'s biological father, Jorge. He stated that he does not disbelieve L.H.'s allegations of sexual abuse, but noted L.H. has a vivid imagination and that in the past, maternal grandmother was responsible for putting thoughts in P.H.'s head that he touched her inappropriately. Jorge stated a lie detector test proved he did not. DCFS's records indicate that the sexual abuse allegations against Jorge were deemed inconclusive in June 2012, and then, in November 2012, the same incident was investigated and deemed unfounded.

7

### 3. *Additional Observations*

The social worker did not observe any marks on Hector or Jaden. The social worker recommended that Hector be assessed for speech delays.

Neither Mother nor Father planned to stay in a relationship together. Mother signed a safety plan to, inter alia, protect the children from Father, seek an emergency protective order as soon as possible, and pending doctor approval, take L.H. in for a sexual abuse forensic exam.[7]

## D.    DCFS Detains the Children

On February 8 and 9, 2021, the juvenile court issued orders permitting DCFS to remove P.H. and L.H. from Mother, and Hector and Jaden from Mother and Father pursuant to section 340.

On February 10, 2021, the social worker, accompanied by law enforcement, removed the children from Mother's custody. While the social worker was at Mother's residence, the maternal grandmother, who was present, told the social worker than when Hector was one month old, maternal grandmother saw Father with Hector's penis in his mouth. The maternal grandmother also recounted that on one occasion when she slept on the sofa in Mother's apartment, she woke up with a bruise on her arm and her pants' zipper broken. She believed Father was responsible for the bruise and the broken zipper.

---

[7] On February 10, 2021, Mother stated she was waiting for the restraining order to be signed. A copy of the restraining order is not in the record and there is no indication whether Mother obtained the restraining order.

On February 10, 2021, a social worker spoke with Father by telephone to inform him that the children had been detained. Father cried and stated he now lived out of state and did not understand why the children were detained from Mother. Father denied the maternal grandmother's allegations about Hector or that he put a bruise on her arm or tore the zipper on her pants. Father noted that when Hector was one month old, they lived in a shelter, and he was never alone with the children.[8]

P.H. and L.H. were placed with Jorge. On February 16, 2021, Hector and Jaden were placed in the home of maternal great cousin. In April 2021, Hector and Jaden were placed with a non-relative caregiver.

## E.     The Petition

On February 16, 2021, DCFS filed a section 300 petition. In counts a-1 and b-2, DCFS alleged that the four children were at substantial risk of suffering serious harm as a result of Mother and Father's domestic violence, from which Mother failed to protect the children. The allegations included that on one occasion, "[P.H.] intervened and stopped the altercation." DCFS further alleged in counts b-1, d-1, and j-1, that L.H. and her siblings were at substantial risk of suffering serious harm as a result of Father's sexual abuse of L.H. and Mother's failure to

---

[8] The record does not disclose that the trial court relied on the maternal grandmother's allegations of Father's sexual abuse of Hector or of Father breaking her zipper while she slept, and we conclude that it is not necessary to determine the reliability of the maternal grandmother's statements to affirm the juvenile court's judgment.

protect the children from the sexual abuse that she allegedly knew about.

## F.   Detention Hearing

On February 17, 2021, the juvenile court found DCFS had made a prima facie showing that P.H., L.H., Hector, and Jaden were persons described by section 300 and ordered them temporarily removed from Mother and Father.  The juvenile court also ordered monitored visitation for Mother, that DCFS to provide no- or low-cost referrals for educational programs for Mother and Father, and that L.H. participate in counseling (P.H. was already receiving counseling services).

## G.   Jurisdiction and Disposition Report, Addendum Reports,[9] and the First Amended Petition

### 1.   *Domestic Violence Allegations*

DCFS reported that on March 11, 2021, Mother acknowledged she had "an anger problem," and that she has thrown things at Father, including a knife.

When asked if Father hit her, Mother responded, "There was a time when I was asleep and I would feel him hit me.  It happened after Jaden was born."  She also confirmed that she and Father fought while at the shelter.  Father tried to leave, but Mother prevented him.  Father was about to grab her neck when P.H. hit him in the back.  Then, in their apartment in February

---

**9** On March 29, 2021, DCFS filed a jurisdiction and disposition report.  DCFS filed addendum reports on April 9, 2021 (attaching the transcripts of the forensic interviews of Mother and L.H.) and May 27, 2021.

10

2021, Mother told Father to leave. Mother pushed Father, and Father choked and punched her.

Mother also acknowledged that she has spanked her kids "a couple of times." She admitted, "I think I have left bruises." She also threw a shoe at P.H. and threw a plastic chair in L.H.'s direction.

Father acknowledged he and Mother argued and yelled, but claimed "I never laid hands on her." He stated Mother "would get a little handsy with me, but she never punched me really hard or punched me on the face." He also stated, "I've never seen her throw objects at the kids."

Jorge stated that when he and Mother were together, she broke his printer and 10 phones out of anger.

L.H. stated that Mother and Father argued and that Father hit Mother.

On March 24, 2021, P.H. told the social worker that Mother and Father constantly fought about cheating. She noted the same types of arguments happened between Mother and her father, Jorge. She explained that at the shelter, it looked like Father had Mother by the neck and started to choke her. In response, P.H. picked up a piñata stick and hit him on the back. P.H. also reported that Mother throws things when she gets angry, including an adult shoe thrown at Father that hit Hector and a "Minnie Mouse" chair thrown at Father that hit L.H.

2. *Sexual Abuse Allegations*

On March 11, 2021, Mother admitted that "[L.H.] told me that [Father] never touched her." "I lied that [L.H.] reported again that [Father] touched her. . . . The reason I did it because I didn't want him to get full custody of the boys."

11

Mother also told the Los Angeles Police Department investigating detective that she "made the whole thing up." She said she told L.H. to lie and promised to get her a doll if she did.

Mother also stated that one day, she left L.H. with Father's stepmom and paternal grandfather (also named James) to drive Father to work. When she returned, L.H. was asleep, naked. When Mother asked L.H. why she was naked, L.H. responded she did not know. Later, maternal great uncle told Mother that L.H. had said that "James touched her." Mother then asked L.H. about whether James touched her, and L.H. said no.[10]

Father continued to deny allegations of sexual abuse. He stated, "I was never left alone with the kids. [Mother] had some stuff happen to her in the past. She watches them closely. She is worried about that happening to her kids." With respect to whether paternal grandfather did anything to L.H., Father said that Mother only told him after the fact what had happened. He asked her why she did not call the police. She responded, "Because I don't know."

P.H. stated that she is unsure if her sister is telling the truth about Father touching her. Mother did not leave the children alone; she either took the children with her or P.H. would watch her siblings. As to the incident when L.H. woke up naked at paternal grandfather's house, P.H. recalled that L.H. woke up with her pajama top and underwear on, but no pajama bottoms. L.H. did not tell her anything about being touched.

When asked if there have been any changes in L.H.'s behavior, Jorge stated that L.H. has nightmares; has mentioned

---

[10] The record does not indicate whether "James" refers to Father or paternal grandfather.

Father, his finger, and her private parts; is extra clingy; and needs him by her side to fall asleep.

The social worker did not interview L.H. about the sexual abuse allegations because she had been interviewed about it multiple times, including a forensic interview on March 9, 2021, and due to her young age. During L.H.'s forensic interview, she stated that while she was in her upper bunk bed, Father pulled down her clothes, touched her "vaginal," and that it felt "ticklish." She stated her sister slept in the lower bunk. L.H. attempted to avoid answering questions and did not provide clear details relating to the circumstances of the abuse.

### 3. *The First Amended Petition*

On March 30, 2021, DCFS amended counts a-1 and b-2 to include allegations that during an altercation, Mother threw a shoe at Father while he was holding Hector. The shoe hit Hector. On another occasion, Mother threw a small plastic chair at Father and struck L.H.

### 4. *Additional Information*

On April 1, 2021, Mother was admitted to the hospital for an involuntary 72-hour psychiatric hold and was diagnosed with severe depression.

During the proceedings, Mother enrolled in domestic violence, parenting, and sexual abuse awareness counseling. By May 15, 2021, she had completed 9 out of 12 parenting classes, and 11 out of 12 domestic violence classes. She also attended individual counseling sessions and was assessed for Regional Center services. The DCFS social worker noted "that [Mother] may have an intellectual disability." "[M]other has a difficult time concentrating, retaining information and understanding what is being told to her." It was determined that Mother

13

required assistance from the Regional Center for daily functioning, including raising her children. DCFS requested further evaluation of Mother's cognitive abilities and capacity to provide appropriate supervision for the children. L.H. and Hector were also referred for Regional Center assessments as there was concern surrounding their development. Mother visited all four children on a regular basis.

At the time of the jurisdiction and disposition report, Father was residing in Arizona and had elected to not have any visits until the dependency proceedings were resolved because he did not want to be accused of improperly influencing the children. By May 26, 2021, however, Father had virtual calls with Hector and Jaden and planned to have a monitored visit on May 27, 2021.

Father did not enroll in any programs.

## H.     The Second Amended Petition

On May 14, 2021, DCFS filed a second amended petition. In count b-3, DCFS alleged that Mother had mental and emotional problems, including severe depression, for which she had been involuntarily hospitalized, and that Mother failed to take the psychotropic medications that had been prescribed to her.

## I.     Jurisdictional and Dispositional Hearing and Orders

At the June 1, 2021, combined jurisdictional and dispositional hearing, Mother and Father argued Mother's allegations of sexual abuse had been falsified. Father's counsel argued L.H.'s statements were unreliable, pointing to, inter alia, inconsistencies in L.H.'s recounting of the circumstances surrounding the inappropriate touching and that the social worker observed that L.H. was highly impressionable. Mother's

14

counsel also argued that Mother had been abused when she was young, so she was sensitive to her children's safety and never left the girls alone with Father. Thus, Mother argued the sexual abuse allegation should be dismissed, or in the alternative, the allegations that Mother failed to protect the children from sexual abuse should be stricken.

The juvenile court found it had jurisdiction over the children pursuant to section 300, subdivisions (a), (b), (d), and (j). It sustained counts a-1 and b-2, relating to domestic violence, but struck the failure to protect language in favor of finding the domestic violence was mutual. The court also sustained count b-3, relating to Mother's mental and emotional health. As to the sexual abuse counts, b-1, d-1, and j-1, the juvenile court discounted Mother's recantation of the sexual abuse, noting that Mother has unresolved mental health issues. Further, the juvenile court found L.H.'s behaviors of having nightmares, being clingy, and changing her underwear frequently was consistent with sexual abuse. It struck Mother's failure to protect from counts b-1, d-1, and j-1 and otherwise sustained those counts.

The juvenile court then determined clear and convincing evidence relating to each sustained count supported removing the children from Mother and Father. It explained that it was concerned about the sexual abuse of a five-year-old girl, and that because Hector and Jaden were too young to be able to express themselves should Father engage in similar behavior with them, removal of the boys from Father was warranted.

Father appealed.

15

**DISCUSSION**

**A.    Legal Principles and Standard of Review**

To remove a child from the custody of a parent with whom the child resided at the time the petition was filed, the juvenile court must find by clear and convincing evidence[11] that one of five grounds exists pursuant to section 361, subdivision (c). (*In re V.L.*, *supra*, 54 Cal.App.5th at p. 154.) Of relevance here, "[o]ne ground for removal is that there is a substantial risk of injury to the child's physical health, safety, protection or emotional well-being if he or she were returned home, and there are no reasonable means to protect the child." (*Ibid.*, citing § 361, subd. (c)(1).) Another ground for removal is that "[t]he minor or a sibling of the minor has been sexually abused, or is deemed to be at substantial risk of being sexually abused, by a parent, guardian, . . . or member of his or her household, . . . and there are no reasonable means by which the minor can be protected from further sexual abuse or a substantial risk of sexual abuse

---

[11] The clear and convincing evidence standard " ' "requires a finding of high probability. The evidence must be so clear as to leave no substantial doubt." ' " (*In re V.L.* (2020) 54 Cal.App.5th 147, 154.) " '[W]hen reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.' " (*Id.* at p. 155 [applying the standard of review articulated in a conservatorship matter to a dependency proceeding], quoting *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995-996.)

16

without removing the minor from his or her parent, guardian . . . ." (§ 361, subd. (c)(4).)[12]

"ʻThe parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.ʼ " (*In re N.M.* (2011) 197 Cal.App.4th 159, 169-170.)

"ʻIn reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial

---

[12] Father argues the juvenile court lacked authority to remove the children from his custody pursuant to section 361, subdivision (c) because Father "maintained a separate residence and did not reside with the children." Father does not cite any evidence to support his contention that at the time the petition was *initiated*, the children did not reside with him. Rather, the record reflects the children, Mother, and Father lived together in an apartment for which Father was named as a tenant on the lease. Nonetheless, Father acknowledges section 361, subdivision (d) authorizes removal of children from a parent with whom the children did not reside at the time the petition was initiated if "the juvenile court finds clear and convincing evidence that would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child for the parent . . . to live with the child or otherwise exercise the parent's . . . right to physical custody." (§ 361, subd. (d).) We observe that the juvenile court's minute orders also cite to section 361, subdivision (d).

court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] ' "[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate]." ' [Citation.]" [Citation.]' [Citation.]" (*In re I.J.* (2013) 56 Cal.4th 766, 773.) "In reviewing for substantial evidence to support a dispositional order removing a child, we 'keep[ ] in mind that the [juvenile] court was required to make its order based on the higher standard of clear and convincing evidence.' [Citations.]" (*In re Nathan E.* (2021) 61 Cal.App.5th 114, 123.)

**B.** **Substantial Evidence Supported Removal of Hector and Jaden from Father's Custody Based on Father's Sexual Abuse of L.H.**

Father argues there was not clear and convincing evidence of a substantial risk of injury necessitating removal of Hector and Jaden from his custody. He first argues that L.H.'s unreliable hearsay statements were the only evidence of the sexual abuse following Mother's recantation of her earlier statements concerning Father's inappropriate touching of L.H. This argument is without merit.

As a preliminary matter, we observe that Father does not challenge the juvenile court's jurisdictional findings, and thus does not contest that the juvenile court's determination that Hector and Jaden were at substantial risk of harm as a result of Father's sexual abuse as alleged in counts b-1, d-1 and j-1 of the

18

second amended petition was supported by a preponderance of the evidence.

Father relies on *In re Lucero L.* (2000) 22 Cal.4th 1227. There, our Supreme Court considered the admissibility and substantiality of the hearsay statements of a three-year-old. The court held, in a plurality opinion, that "a juvenile court may not base its findings solely on the hearsay statements of a truth-incompetent child—that is, a child who may not testify because she is too young to separate truth from falsehood—unless the child's statements bear 'special indicia of reliability.' " (*In re I.C.* (2018) 4 Cal.5th 869, 875 [summarizing the holding of *In re Lucero L., supra*].)

Father made similar arguments in the juvenile court, which the juvenile court rejected. The juvenile court determined it would not credit Mother's recantation, observing Mother had been suffering from severe depression at the time she stated that she had made up the sexual abuse allegations and told L.H. to lie. We are not in a position to question the court's credibility determinations or reweigh the evidence. (See *In re I.J., supra*, 56 Cal.4th at p. 773.) Thus, the juvenile court's findings were not based solely on L.H.'s hearsay statements. Rather, the record also included corroborating statements from Mother and L.H.'s father, including statements about L.H.'s conduct that were consistent with sexual abuse.

Mother and L.H.'s father observed that L.H.'s behavior had changed in that she had nightmares, could not sleep by herself, and was extra clingy. Mother also testified that L.H. engaged in sexualized behaviors such as grinding on the couch and that L.H. changed her underwear several times a day. Further, well before Mother claimed to have made up the sexual abuse allegations in

19

February 2021 to prevent Father from getting custody of the boys, another allegation of Father sexually abusing L.H. had been made in July 2020.

Additionally, substantial evidence supports the conclusion that L.H. is not "truth incompetent." The forensic interviewer established that L.H. knew when to say "I don't know." The forensic interviewer also established that L.H. was able to disagree and correct incorrect statements, and linked that practice to the question, "Will you tell me the truth?" Further, L.H.'s allegations bore an indicia of reliability. Her core allegations were consistent. She told a registered nurse, a forensic interviewer, the social worker, and her father that Father had touched her vagina or private part, under her clothes, with his finger.

Next, Father argues that neither of his son's experienced or was exposed to Father's alleged sexual abuse, and that his sons are dissimilarly situated from L.H. in terms of age, gender, and biological connection. In *In re I.J.*, our high court addressed the question of whether a father's sexual abuse of his daughter supported the juvenile court's exercise of jurisdiction over his sons under section 300, subdivision (j) relating to abuse of a sibling even when there was no evidence the father sexually abused or otherwise mistreated his sons. (*In re I.J.*, *supra*, 56 Cal.4th at pp. 770, 772.) In holding the juvenile court's dependency jurisdiction over the sons was proper, our Supreme Court explained, " '[s]ome risks may be substantial even if they carry a low degree of probability because the magnitude of the harm is potentially great.' " (*Id.* at p. 778.) The court further explained that under subdivision (j) of section 300, the juvenile court is to consider the totality of the circumstances of the child

and his or her siblings, including "the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child.' (§ 300, subd. (j).)" (*Id.* at p. 774.) Subdivision (j) "thus accords the trial court greater latitude to exercise jurisdiction as to a child whose sibling has been found to have been abused than the court would have in the absence of that circumstance." (*Ibid.*)

Although *In re I.J.* concerned the juvenile court's jurisdictional findings, and Father does not challenge the juvenile court's jurisdictional findings, both Father and DCFS agree that it provides relevant guidance here. Given that *In re I.J.* concerns a fundamental question at issue in this appeal—i.e., whether sexual abuse of a sibling (or, here, half-sibling) can support removal of a child of the opposite sex—and that the same evidence that supports the juvenile court's exercise of jurisdiction is sufficient to the removal of Hector and Jaden from Father's custody, we agree. (See *In re S.R.* (2020) 48 Cal.App.5th 204, 207 [quoting *In re I.J.* for the proposition that " ' "even . . . a low degree of probability" ' can give rise to a substantial risk if ' "the magnitude of the harm is potentially great," ' " and affirming removal].) Following the guidance of *In re I.J.* to consider the totality of the circumstances, we conclude substantial evidence supported the juvenile court's removal order.

We are not convinced that the difference between the age and gender of the children here alleviate the risk to Hector and Jaden. In *In re P.A.* (2006) 144 Cal.App.4th 1339, the appellate court considered whether five- and eight-year-old boys were at risk of sexual abuse after the father twice touched his nine-year-

21

old daughter's vagina. The court concluded that "where . . . a child has been sexually abused, any younger sibling [including one of the opposite sex] who is approaching the age at which the child was abused, may be found to be at risk of sexual abuse." (*Id*. at p. 1347.) Here, like the children in *In re P.A.*, L.H., Hector, and Jaden were sufficiently close in age to warrant removal. When Father sexually abused L.H. in December 2020, she was on the verge of turning five years old; Hector was approximately one-and-a-half years old; and Jaden was approximately half-a-year old.

Further, Father contends his relationship with L.H. differs from that with his sons because he is not biologically related to L.H. However, Mother and Father had dated since approximately 2017 or 2018, at least two years before the abuse, and had lived together for some time in Laughlin, in a shelter, and then in their apartment. Given L.H.'s young age and her concomitant reliance on Father as the father figure in the household, Father's sexual abuse of L.H. was abhorrent and unnatural. (See *In re I.J.*, *supra*, 56 Cal.4th at p. 778 [" '[S]exual or other serious physical abuse of a child by an adult constitutes a fundamental betrayal of the appropriate relationship between the generations' "].)

Additionally, the juvenile court's observation that Hector and Jaden were too young to express themselves (and Hector may have developmental delays) and, thus, would be unable to indicate they needed help is well-taken. Because the children therefore could not cry for help, fight back, or report any inappropriate touching, the risk of abuse was greater than it would be for an older child. Moreover, a sibling need not be inappropriately touched to suffer a risk of substantial harm as

exposure to sexual abuse is also harmful. (See *In re I.J.*, *supra*, 56 Cal.4th at p. 778 ["Also relevant to the totality of the circumstances surrounding the sibling abuse is the violation of trust shown by sexually abusing one child while the other children were living in the same home and could easily have learned of or even interrupted the abuse"]; *In re Andy G.* (2010) 183 Cal.App.4th 1405, 1412 [" 'We do not discount the real possibility that brothers of molested sisters can be molested [citation] or in other ways harmed by the fact of the molestation within the family. Brothers can be harmed by the knowledge that a parent has so abused the trust of their sister. They can even be harmed by the denial of the perpetrator, the spouse's acquiescence in the denial, or their parents' efforts to embrace them in a web of denial' "]; see also *In re Karen R.* (2001) 95 Cal.App.4th 84, 89-91 [finding son was also sexually abused because he had seen his sister beaten by the father and was told by his sister about the rape immediately thereafter].) Although Father claims Hector was not exposed to his inappropriate touching of L.H., the record demonstrates that L.H. and Hector shared a room and that at times, L.H. shared her bed with one of her brothers.

Also relevant to the determination that removal of Hector and Jaden from Father was proper is that by the time of the combined jurisdictional and dispositional hearing, Father had not enrolled in any educational programs. Father's failure to do so is probative of the fact that there were no other reasonable alternatives to removal because it strongly indicates Father has failed to confront and deal with the issues giving rise to the court's jurisdiction. (See § 366.21, subd. (e)(1) ["The failure of the parent or legal guardian to participate regularly and make

23

substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental"].)

## C. Substantial Evidence Supported Removal of Hector and Jaden from Father's Custody Based on Father's Domestic Violence Against Mother

Father argues that the evidence of a substantial risk of serious harm due to domestic violence was insufficient to support the juvenile court's removal order. He contends that because he and Mother are no longer in a relationship and he lives in Arizona, there is no current risk of harm to his sons.

In *In re Daisy H.* (2011) 192 Cal.App.4th 713, 717, this court explained that "[p]hysical violence between a child's parents may support the exercise of jurisdiction under section 300, subdivision (b) but only if there is evidence that the violence is ongoing or likely to continue and that it directly harmed the child physically or placed the child at risk of physical harm." In that matter, DCFS alleged the father choked the mother and pulled her hair. The record disclosed, however, that those incidents occurred seven years before DCFS filed the section 300 petition, and that none of the incidents occurred in the presence of the children. (*Ibid.*) Thus, there was no reason to believe the violence would continue into the future and place the children at risk of harm.

Here, however, the incidents of violence were not so remote in time. Father choked and punched Mother on February 3, 2021, the day before DCFS initiated its investigation of the instant matter and a mere four months before the juvenile court ordered the children removed from Father. Moreover, the record reflects a pattern of violence and discloses that Father (and Mother) lack sufficient awareness of and impulse control to not

24

resort to physical violence.  Mother acknowledged that she and Father had a history of violence and between December 2020 and February 3, 2021, she and Father had three physical altercations. Even a few months before December 2020, Father choked Mother while the family lived in a shelter.  Also, unlike *In re Daisy*, the children were present both times Father choked Mother.  In the first instance, P.H. felt compelled to intervene to protect Mother and hit Father with a stick.[13]

Further demonstrating his lack of awareness or interest to change, throughout the proceedings Father claimed he never laid a hand on Mother, minimized Mother's violence against him (noting she gets a little handsy, but does not punch him in the face), and did not enroll in any educational programs.  Father's failure to acknowledge his violence and seek treatment is especially concerning when viewed in the context that Father spent 17 years in prison for voluntary manslaughter, suggesting a propensity for violence.  Indeed, other courts have observed, " ' "[P]ast violent behavior in a relationship is 'the best predictor of future violence.'  Studies demonstrate that once violence occurs in a relationship, the use of force will reoccur in 63% of those relationships. . . . *Even if a batterer moves on to another relationship, he will continue to use physical force as a means of controlling his new partner*." [Citation.]' [Citation.]" (*In re R.C.* (2012) 210 Cal.App.4th 930, 942, italics added.)

---

[13] In criminal sentencing, strangulation is recognized as aggravated conduct reflecting an exceptionally callous disregard for human suffering.  (See *In re Scott* (2004) 119 Cal.App.4th 871, 891-892.)  While this is not a criminal matter, Father's tendency to resort to choking Mother is concerning and reflects a lack of aversion to violence.

Accordingly, at the time of the dispositional hearing, Father demonstrated a tendency towards physical violence and provided no reason for the court to believe those tendencies would change. Moreover, the juvenile court need not consider Father's sexual abuse of L.H. and domestic violence with Mother in isolation when considering whether Hector and Jaden were at substantial risk of serious harm. As a practical matter, the juvenile court evaluates the aggregate risk to Hector and Jayden if they were not removed from Father's custody, including the risk occasioned by Father's abuse of L.H., domestic violence with Mother, Father's failure to acknowledge the domestic violence between him and Mother, and Father's failure to pursue educational or treatment programs to assist him in addressing the issues that gave rise to the juvenile court's jurisdiction.

Finally, because Father lived in Arizona, there were no reasonable means by which Father could have custody of the children and be sufficiently monitored to ensure the children were not exposed to domestic violence or sexual abuse, especially given the continuing strain on child protective services resources during the Covid-19 pandemic.

## DISPOSITION

The June 1, 2021 dispositional orders removing Hector and Jaden from Father's custody are affirmed.

NOT TO BE PUBLISHED


KELLEY, J.*


We concur:


CHANEY, J.


BENDIX, Acting P. J.

---

*\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.*